# CHARLESTON

CHESAPEAKE & OHIO RAILWAY CO. v. PUBLIC SERVICE COMMISSION.

Submitted September 22, 1914.    Decided October 13, 1914.

1. RAILROADS—*Transportation Facilities—Order of Public Service Commission—Determination of Reasonableness.*

    Though competent upon an inquiry as to the reasonableness of an order entered by the Public Service Commission requiring installation and operation of a passenger carrying service on a lateral line constructed under the provisions of §2983, Code 1913, a comparison of the expenses incident thereto with prospective returns therefrom is not controlling. (p. 104).

2. SAME—*Transportation Facilities—Order of Public Service Commission—Determination of Reasonableness—Factors Considered.*

    *Quere:* Whether, in determining that question, the relation of the branch line to the system of which it is a part, the public convenience to be served, the character and volume of traffic, personal and freight, present and prospective, the necessary cost of installation and of service, and the effect on the revenues of the entire system, are factors to be considered and viewed in the light of all the

circumstances and conditions attendant upon the performance required.  (p. 106).

3.  SAME—*Transportation Facilities—Order of Public Service Commission—Determination of Reasonableness.*

*Quere:* Whether, in a proceeding to obtain from the Commission an exercise of the power conferred by §4, Ch. 9, Acts 1913, the question of revenue to a railroad company from a branch line, in so far as deemed controlling on the fairness and reasonableness of a requirement for passenger service thereon, is to be determined by consideration of both freight and passenger traffic originating on the branch line in connection with the railroad system as a whole; and if, when so considered, the total returns from such traffic permit of a reasonable margin of profit to the company, it can properly complain that the requirement entails a loss on the passenger service alone.    (p. 104).

4.  SAME.

*Quere:* Whether, before an order of the Commission requiring adequate passenger facilities on a lateral line can be deemed confiscatory, it must appear that the revenues of the entire system are insufficient to meet the additional expense necessary therefor with a fair margin of profit.  (p. 105).

5.  SAME—*Public Service Commission—Powers.*

Such Commission has authority, under Ch. 9, Acts 1913, to require railroads to provide adequate facilities for the transportation of persons and property on both main and lateral lines.  (p. 105).

6.  SAME—*Transportation Facilities—Duty to Furnish.*

So long as it retains its corporate entity, a railroad is legally compellable to furnish reasonably adequate facilities for the transportation of persons and property on the lines operated, whether main or branch lines, subject to such regulations and charges as are prescribed by statute, or by the corporation not inconsistent with general statutory provisions; provided only that the requirement therefor, viewed in the light of all the circumstances attendant thereon, does not entail a substantial loss to the operator.

7.  SAME—*Confiscation—Burden of Proof.*

On the operator rests the burden of showing data from which to determine whether the required service is in effect confiscatory.  (p. 105).

8.  SAME—*Reasonableness of Service—Factors.*

Mere excess of estimated operating expenses above prospective returns from the required service on a branch line is inadequate upon the question of reasonableness.  Other factors are requisite for that purpose.  (p. 106).

9.  SAME—*Adequate Service—Requirement.*

Requirement of adequate service and facilities therefor does not presuppose the previous existence of either service or facilities. It applies alike to cases where the carrier has failed to provide any service and where it has provided insufficient service or facilities. (pp. 105, 106).

Petition by the Chesapeake & Ohio Railway Company against the Public Service Commission to suspend an order entered on the petition of John Vawter and others.

*Order Refused.*

*Enslow, Fitzpatrick, Alderson & Baker,* for petitioner.

*A. A. Lilly,* Attorney General, and *Frank Lively,* Assistant Attorney General, for respondent.

LYNCH, JUDGE:

After due notice and hearing, upon the petition of John Vawter and others similarly situated, the Public Service Commission entered an order requiring the Chesapeake & Ohio Railway Company, a common carrier, to inaugurate and maintain a passenger service, to consist of two trains daily each way except Sunday, between Hawk's Nest, a station on its main line, and Ansted, a distance therefrom of two and a half miles. Ansted, according to the proof, has a population of 1200 to 1500 people, and is the trade center for an active business community surrounding it with an estimated total of about 6000 persons, including those residing within its corporate limits. At the date of the order, and prior thereto, the only method of travel between the two points was, and so far still is, on foot or by hack or other vehicle of like character, over unimproved and dangerous mountain roads. Although the company had constructed and since 1890 has continuously operated a branch or lateral line to and beyond Ansted, it has at no time installed a passenger service over it, but has exclusively devoted the line to the haulage of freight, consisting for the most part of coal from collieries near Ansted. On the contrary, it has persistently refused to provide such service, to require which Vawter, a resident of Ansted, and those associated with him, instituted the proceed-

ing before the Public Service Commission, with the result stated.  Of this order the railroad complains.

At common law, and, in this state, under constitutional and statutory provisions, railroad companies, because their corporate existence emanates from the public, owe to it in return therefor certain duties performance of which they can not evade, among them being the establishment and maintenance of reasonable facilities for transportation of both persons and freight.  Such duties have always existed.  They were not created by any statute.  They are common-law requirements.  *Southern Pacific Co.* v. *Commission,* 119 Pac 727; Mills, Em. Dom. § 14; *Alcott* v. *Supervisors,* 16 Wall. 678.  By §9, Art. 11 of the Constitution, and §71, Ch. 54, Code 1913, railroads are declared to be public highways and as such "free to all persons for the transportation of their persons and property thereon, under such regulations as shall be prescribed by law."  As the most available method for the enforcement of these common-law duties, confirmed by statutes, the legislature created a Public Service Commission, and clothed it with ample authority to require railroad and other transportation companies to establish and maintain such adequate and suitable public service facilities and conveniences and perform such service in respect thereto as shall be deemed reasonable, safe and sufficient and in all respects just and fair.

Though upon appeal the company charges failure on the part of the Commission properly to conceive and apply §4, Ch. 9, Acts 1913, serial section 639, Code 1913, it does not point out, in argument or otherwise, any particulars wherein the Commission either misconceived the purpose or meaning of the section or misapplied it to the facts upon which the order was based.  Nor does it now argue that the section does not empower the Commission to require the corporation to install and maintain adequate facilities in respect to its public duties.  And reasonably it could not; because, as the statute provides, "every railroad and other transportation company may be required by the Commission to establish and maintain such suitable public service facilities and conveniences as may be reasonable and just".  So that we

are concerned only with the inquiry whether the company was derelict in the performance of such duties, and, if so, whether the Commission's order was reasonable and just.

Evidently, the branch line was constructed under the provisions. of §2983, Code 1913, authorizing the building of lateral lines. The company intended the line to Ansted chiefly for the haulage of freight, and not for the transportation of passengers. But the purpose then contemplated avails not as an excuse for avoiding duties imposed by law upon common carriers. When built, the line became an integral part of the extensive Chesapeake & Ohio system, and must be treated and controlled as such, and not merely as a segregated part of it; for Ch. 9, Acts 1913, clearly evinces an intention on the part of the legislature, through the Commission, to control both main and lateral lines, whether operated under the same or different management or ownership.

What, then, did the legislature intend when it required the establishment and maintenance of adequate and suitable facilities and the performance of reasonable, safe and sufficient railroad service? Surely, one important purpose was to secure adequate facilities and conveniences for serving the public. Failure or refusal of the company to perform any service, or to provide the facilities therefor, can not be deemed adequate, reasonable or sufficient. To be adequate, the service and facilities must be commensurate with the duties to be performed, the extent of the demand for transportation, the cost and returns of the additional service when properly ascertained and found to be consonant with the various other circumstances and conditions under which performance is required. That such conditions exist, necessitating the additional service, is obvious. The proof shows a large tributary population, accessible to the line already constructed and actively operated, whose comfort and convenience will be promoted by the service required; and that the railroad company has made no attempt to provide any facilities for the carriage of passengers between Hawk's Nest and Ansted. Nor does the mere fact that such service and facilities therefor have not heretofore been provided prevent the requirement of both service and facilities. The word adequate does

not presuppose the previous existence of either service or facilities therefor. It is applicable alike to cases where the railroad company has failed to provide any service and where it has provided insufficient service. *Southern Pacific Co.* v. *Commission, supra; Railroad Co.* v. *Commission,* 129 Pac. 506.

But the main ground of complaint urged by the company relates to the expense incident to compliance with the order, and the probable inadequacy of returns from the service required. It is insisted that, because operating expenses, when limited to the branch line, will, under the same limitation, exceed the revenues derivable from the service thereon, the Commission's order is essentially unreasonable, and should not be enforced. So to hold would operate as a valid excuse for the refusal of personal transportation on many sections of transcontinental lines and, it may be, most lateral lines. Though competent upon an inquiry as to the reasonableness of the requirement, the results of a comparison of expenses with prospective returns, under such limitations, is not controlling. While, when segregated from the system of which they are integral parts, branch lines may not yield profitable returns, it does not follow that, because part of the system is operated at a loss, results of general operations do not leave a margin of profit. As feeders, they assemble passengers and freight for transportation over the main lines, and thereby add valuable increments to the gross revenues of the operating companies; and, though not conclusive, this result is an important factor in the solution of the question of profits.

The facts established by proof introduced by the railroad company aptly illustrate our meaning. From the haulage of freight over the Hawk's Nest Branch to Ansted for the year 1913, the gross returns to the company, on 242,280 tons, were $301.881.70, of which an amount ranging from $3018.81 to $7547.02 was credited to that branch as its share; and for the transportation of passengers from the service required it estimates an annual outlay of $12,000 for maintenance and $2400 as prospective returns therefrom, or two per cent of the cost—thus entailing serious loss from the required service. From these facts alone, the corporation urges a determination

in its favor upon the question of the reasonableness of the order of which it complains. It furnishes no other data, except that which pertains to location of the branch and the hazard of the service, due to the topography of the country through which the branch line is operated.

These facts, however, do not afford the true basis for determination of the issues involved. Something more is required. Many competent authorities hold that, "in determining the reasonableness of any branch line service, the relation of the branch to the system as a whole, the needs of the public tributary to the branch, the character and volume of the traffic both present and prospective, the cost of operation, and its effect upon the revenues of the entire system must be considered, and every factor given such weight as in the light of all the circumstances the situation warrants". *Nelson* v. *Railway Co.*, 8 Wis. Ry. Com. 85; *Railroad Co.* v. *Commission,* 58 So. (La.) 862; *State* v. *Railway Co.,* 239 Mo. 196; *Railroad Co.* v. *Commission,* 152 Wis. 654; *Railroad Co.* v. *Commission,* 54 Col. 64; *Railroad Co.* v. *Gill,* 156 U. S. 649; *Smith* v. *Ames,* 169 U. S. 466; *Commissioners* v. *Railway Co.,* 7 Int. Com. R. 69; *Brabham* v. *Railway Co.,* 11 *Ib.* 464. These decisions are based on the theory of the corporate entity, or unity of ownership. Other authorities, however, determine the question of the reasonableness of any particular service or rate from the prospective revenues derivable from the same service or rate on the railroad system as a whole. Or, as held in *Railroad Co.* v. *Philadelphia County,* 220 Pa. 100, "in determining whether the passenger rates prescribed by Act April 5, 1907, were unjust as to a particular carrier, the passenger traffic of the road should be considered as a separate and independent subject from the freight traffic". Others, again, further limit the comparison to intrastate traffic.

But what constitutes a proper collocation of factors adequate for a just determination upon an inquiry as to the reasonableness of any public service required and sought to be enforced, we deem it unnecessary now to decide; because, while competent and to be considered, those furnished here are not all the factors necessary for a just decision upon such inquiry. In the absence of such data, the burden of provid-

ing which the company assumed upon this appeal, we can not condemn as unreasonable the requirement of which complaint is made.

*Order Refused.*