RAPID RAILWAY CO. *v.* MICHIGAN PUBLIC UTILITIES
COMMISSION.

1. CERTIORARI—QUESTION WILL BE REVIEWED TO PREVENT FAILURE
OF JUSTICE ALTHOUGH OTHER REMEDY AVAILABLE.
   Although the Constitution confers upon the Supreme
   Court the power to issue writs of certiorari, they are not
   usually allowed when there is another and adequate
   remedy, but an exception is frequently made, and de-
   termination had under such writs when necessary to pre-
   vent a failure of justice.

2. SAME — ORDER OF PUBLIC UTILITIES COMMISSION REVIEWED
WHERE RIGHT TO BILL IN CHANCERY LOST.
   In view of the fact that the allowance of a writ of cer-
   tiorari by the Supreme Court to review an order of the
   public utilities commission was an indication to counsel
   that the question presented could be thus disposed of, and
   that in the meantime plaintiff has lost its right to review
   by bill in chancery, as provided in 2 Comp. Laws 1915,
   § 8134, this court will consider the question as properly
   before it for such disposition as can be made of it in this
   proceeding.

3. SAME—ORDERS OF COMMISSION QUASI-JUDICIAL.
   The claim that the public utilities commission is but a
   ministerial body, and its orders not subject to review by
   certiorari, cannot be sustained, since it is an official board,
   and its orders are of a *quasi*-judicial nature.

4. STATUTES—INTERPRETATION OF STATUTES.
   In the interpretation of statutes, the intent of the legisla-
   ture, if it can be ascertained from the language of the
   act, must control.

5. COMMON CARRIERS— POWERS OF PUBLIC UTILITIES COMMISSION TO
LICENSE MOTOR VEHICLE TRANSIT COMPANIES.
   On certiorari to review an order of the public utilities
   commission under Act No. 209, Pub. Acts 1923, granting
   a permit to a transit company to engage in the business
   of transporting passengers for hire by motor vehicles
   between certain cities already connected by steam and

electric railroads, *held*, that the commission, in determining the "public convenience and necessity," should exclude from its consideration the transportation facilities already furnished by said railroads; there being no intimation in said act of any intention to protect their interests by preventing competition by motor vehicles. FELLOWS, J., dissenting.

Certiorari by the Rapid Railway Company against the Michigan public utilities commission to review an order granting a permit to engage in the business of transporting passengers for hire. Submitted November 13, 1923. (Docket No. 160.) Writ dismissed December 19, 1923.

*Stevenson, Carpenter, Butzel & Backus (W. L. Carpenter, H. E. Spalding,* and *W. G. Fitzpatrick,* of counsel), for appellants.

*Andrew B. Dougherty,* Attorney General, *Clare Retan,* Deputy Attorney General, *O. L. Smith,* Assistant Attorney General, *D. H. Crowley,* and *Samuel D. Pepper,* for appellee.

SHARPE, J. On application therefor, this court allowed a writ of certiorari to review an order of the defendant granting a permit to the Wolverine Transit Company "to engage in the business of transporting passengers for hire" between Detroit and Mt. Clemens, pursuant to the provisions of Act No. 209, Pub. Acts 1923. The defendant has made return to the writ. By stipulation, the transit company was made a party defendant, with rights as though the writ had issued as to it, and it now moves to dismiss the writ as improvidently granted, for the reason that, as the statute provides a specific method for the review of such orders, the order in question may not be reviewed on certiorari.

The Michigan public utilities commission was

created by Act No. 419, Pub. Acts 1919 (Comp. Laws Supp. 1922, § 8164 [1-12]).    Section 9 provides:

"Any order or decree shall be subject to review in the manner now provided by law for reviewing orders and decrees of the Michigan railroad commission." *  *  *

The Michigan railroad commission was created by Act No. 300, Pub. Acts 1909 (2 Comp. Laws 1915, § 8109 *et seq.*).    Section 3 of the act of 1919 abolished this commission, but provided:

"All the rights, powers and duties now vested by law in said railroad commission shall be deemed to be transferred to and vested in said public utilities commission and shall be exercised and performed thereby, except as herein otherwise provided."

Section 26(*a*) of the railroad commission act (§ 8134) provides for the review of any order made by the commission by a bill in equity filed in the circuit court for the county of Ingham.    The following sections provide that additional proof may be taken on the trial, for further action by the commission in certain cases, and for appeal to this court from the final order of the circuit court as in other chancery cases.

Section 4 of Act No. 209, Pub. Acts 1923, provides:

"Any law or laws now in force or hereafter enacted, regulating the practice before said commission, or the method of reviewing its order, shall apply with equal force and effect to proceedings had or taken before said commission under this act."

The question presented is whether the review therein provided for is exclusive of all other remedies for testing the validity of the order made.    The Constitution confers upon this court the power to issue writs of certiorari.    *Pollitz* v. *Railroad Commission*, 205 Mich. 549, 566.    They are not usually allowed when there is another and adequate remedy.    *In re Phillips*,

154 Mich. 139, 141; *Township of Custer* v. *Dawson,* 178 Mich. 367, 372.    An exception has frequently been made and determination had under such writs when necessary to prevent a failure of justice.    *People* v. *Turja,* 157 Mich. 530, and cases cited.    Section 26 (*a*), providing for review by bill in chancery, limits the time for filing same to thirty days from the making of the order complained of.    This time had not elapsed when the petition for certiorari herein was filed in this court.    Our allowance of the writ was an indication to counsel that the question presented could be thus disposed of.    While we have on several occasions dismissed such writs for the reason that they were improvidently granted (*White* v. *Boyce,* 88 Mich. 349), we are persuaded that, as petitioner has lost its right to review by bill in chancery, we should consider the question here presented as properly before us for such disposition as can be made of it in this proceeding.    *Scrafford* v. *Board of Sup'rs of Gladwin Co.,* 41 Mich. 647; *Alward* v. *Board of Sup'rs of Oakland Co.,* 187 Mich. 573; *Baldwin* v. *Board of Sup'rs of Alger Co.,* 189 Mich. 372.    The claim made that the utilities commission is but a ministerial body, and its orders not subject to review by certiorari, is met by the cases above cited, to which may be added *McGurrin* v. *Grand Rapids Township Board,* 186 Mich. 475, and *Pollitz* v. *Railroad Commission, supra.* It is an official board, and its orders certainly are of a *quasi*-judicial nature.

The title to Act No. 209 and its first section read as follows:

"An act to regulate and define common carriers of persons and property by motor vehicle on public highways of this State, prescribing the payment and fixing the amount of privilege taxes for such carriers, the disposition of such taxes, and prescribing penalties for violation of this act.

"SECTION 1. After thirty days from the effective

date of this act, no person, firm or corporation shall engage or continue in the business of transporting persons or property, by motor vehicle, for hire, upon or over the public highways of this State, over fixed routes or between fixed termini, or hold themselves out to the public as being engaged in such business, unless and until they shall have obtained from the Michigan public utilities commission a permit so to do, which said permit shall be issued in accordance with the public convenience and necessity and shall not be assignable: *Provided,* that this act shall not apply to carriers operating exclusively within cities or villages."

The majority of the commission held that the language of this section "limits the inquiry" as to "whether a public convenience and necessity exists, to the motor vehicle business." Commissioner Pepper, while then of the opinion that the act "does not fix any limit on the inquiry," in the brief filed by him in this court says:

"An examination of the entire act fails to disclose a single word or provision which in any way indicates that the legislature had in mind the establishment of a policy of protecting existing railroad transportation interests as against motor transport interest."

In the interpretation of statutes, the intent of the legislature, if it can be ascertained from the language of the act, must control. Its legislative history may be considered. The title to the bill (No. 258) as introduced in the senate read: "A bill to regulate carriers of persons and property on the public highways of this State." It contained no language relating to public convenience or necessity. The senate committee reported it favorably, with certain amendments, among them one to insert the language in question. This amendment was agreed to, and the bill as thus amended was referred to the committee of the whole. No change in this amendment was there made, but on third reading the amendment was

stricken out. The title was then amended to read as it now does in the act, and, as thus amended, the bill passed, and was sent to the house. When considered in committee of the whole in that body, the words, "shall be issued in accordance with the public convenience and necessity," were again inserted. As thus amended, it passed the house and this amendment was concurred in by the senate.

The purpose of the bill as introduced was to regulate the use of such motor vehicles on the highways. The amendment proposed and adopted was germane to such purpose. We find no intention expressed to do more than this. It is a matter of common knowledge that the traffic on many of our highways has become so great that accidents due thereto are frequent and travel much impeded. The act in question is the first attempt on the part of the legislature to restrict the number of motor vehicles using the highways for the conveyance of persons and property for hire. The bill as introduced sought to do so by imposing a privilege tax upon them. The amendment requiring a finding by the commission of public convenience and necessity, thus empowering the commission in the public interest to determine the number of persons, firms or corporations who should be permitted to so operate, was but another step in the exercise of such control. If a permit is asked for to operate such vehicles between points not served by steam or electric roads, the act empowers the commission to apply the test of public convenience and necessity in determining whether it shall be granted. Ordinarily, the commission would have but little difficulty in determining the question. If the commission find, under the proofs submitted, that the public will be reasonably well served under a permit or the permits theretofore granted, it may refuse to grant another. Without extending the application of this

provision beyond the general scope and object of the
act, we have a workable statute, complete in all of
its details.   To extend it as contended for by the
plaintiffs will open up a field of investigation and lead
to possible results which, we feel constrained to hold,
were not within the contemplation of the legislature
when the bill was passed.   In *Estate of Ticknor,* 13
Mich. 44, 52, Mr. Justice CAMPBELL, speaking for the
court, said:

"In order to determine whether this statute reaches
the case before us, we must look beyond isolated
phrases to the general tenor and design of the act
itself.   It has always been a rule of construction
(and our constitutional provision requiring the pur-
poses of a statute to be indicated by its title, is but an
extension of this rule), that the application of particu-
lar provisions is not to be extended beyond the general
scope of a statute, unless such extension is manifestly
designed.   Legislatures, like courts, must be con-
sidered as using expressions concerning the thing they
have in hand; and it would not be a fair method of
interpretation to apply their words to subjects not
within their consideration, and which, if thought of,
would have been more particularly and carefully dis-
posed of."

In *Grand Rapids, etc., R. Co. v. Stevens,* 219 Mich.
332, wherein it was sought to enjoin the operation of
motor vehicles upon the public highways because of
their unfair competition as against an electric road,
this court pointed out that such regulatory power must
be exercised by the legislature and municipalities, and
not by the courts.   This decision was handed down in
July, 1922.   It seems clear that there was no intent
to exercise such power by this bill as introduced.   The
amendment, as pointed out, had a well-defined purpose,
exclusive of any such intendment.

Our attention is called to the holdings of the courts
and commissions in other States.   In New York, by
chapter 667 of the Laws of 1915, persons or corpora-

tions owning or operating a "bus line or motor vehicle line" are included in the term "common carrier" as used in the public service commissions law, and under that law all such carriers must procure a certificate of convenience and necessity before engaging in the business.     Substantially similar provisions are found in the Illinois public utilities act (Hurd's Revised Statutes, 1919, chapter 111*a*).     Under our act (209), persons so engaged are deemed to be common carriers and subject to the applicable provisions of the law relating thereto.     But we have no statute providing for such a certificate where new steam or electric roads are sought to be constructed and operated.

The grant of the power to determine whether, in view of the service rendered by other means of transportation, a necessity exists, or the public convenience requires, that a new system of transportation should not be permitted in competition with those operating between certain points, should not be inferred unless the language is fairly expressive of such an intent on the part of the legislature.     This is an age of evolution in the transportation business.     Steam railroad service greatly reduced the earnings of the vessels carrying passengers and freight, and put the stage coach out of business.     Electric cars have much affected the business of the steam roads between certain points.     The use of motor vehicles will doubtless decrease the earnings of the electric roads.     If it be desirable to clothe the commission with the power to prevent such competition by refusing to permit motor vehicles to operate, when the service rendered by the steam and electric roads is adequate to the needs and convenience of the public, we think the legislature should so provide in no uncertain language.

The writ is dismissed.

MCDONALD, CLARK, BIRD, MOORE, and STEERE, JJ., concurred with SHARPE, J.

FELLOWS, J. (*dissenting*).   I agree that we may on certiorari determine the legal question here presented, but I am unable to agree with the conclusion reached by my Brother SHARPE, as to how that question should be answered.   The act in question provides:

"Said permit shall be issued in accordance with the public convenience and necessity."

The sole legal question presented on this record is:

"Must the commission in determining the question of public convenience and necessity exclude from its consideration the facilities for transportation already in existence and serving the territory?"

My Brother concludes that this question should be answered in the affirmative.   I think it should be answered in the negative.   I think the commission may take into consideration in determining the conveniences and necessities of the public for additional transportation facilities what the existing transportation facilities are.   There are doubtless many other things the commission should take into consideration. I do not think present facilities should in all cases be controlling.   They are not exclusive of other consideration, but in my judgment they should not be excluded from consideration by the commission.   The ultimate question for the commission to determine is:  Do the public convenience and necessity require the granting of the permit?   In my judgment the commission in answering this question may consider what service the public now has:  Is it adequate for all the needs and conveniences of the public, or is something additional required?

The words here used, "public convenience and necessity," have a well understood meaning in public utility statutes.   They are found in interstate commerce acts, in numerous public utility commission acts

225—Mich.—28.

of our sister States, and in our own telephone act (Act No. 206, Pub. Acts 1913, § 9 [2 Comp. Laws 1915, § 6697]). I perceive no necessity to resort to the legislative history of the act, nor do I perceive any significance in the legislative history. The bill took the ordinary course that thousands of bills have taken. It was introduced and referred to the proper committee, amended in the committee and on the floor, went to the other house where a like course was pursued. The power of the commission was doubtless broadened by the amendment beyond the original intention of the introducer. But we must consider the act as finally passed not as the bill was introduced.

My Brother refers to the elimination of the stage coach in olden days by the steam roads and later to the competition by electric lines. But those were days of the "survival of the fittest," of competition by carriers for business. They were before the State and Federal governments had assumed regulatory power over public utilities. There are probably some today who feel that the State and Federal governments have gone too far in the regulation of these public service companies, and that the public would be better served if the companies were permitted to go into the sphere of their activities and bid for the business. But the legislative department of the governments, Federal and State, which have the final determination of this question within the limits of the Constitution have determined that a wise public policy requires in the interest of the public at large a regulatory supervision over their activities. The sovereign either directly or by delegated agencies fixes the rate they may charge for their service, and they must charge to all the rates fixed by the State. They may not discriminate between individuals or between localities. If the service is inadequate they may be required by the State to make it adequate. Their

capitalization is regulated by the sovereign. They must install safety devices. The number of men they employ under certain conditions have been fixed by statute and in one instance the wage they pay was fixed by legislative mandate. This legislation has been based on the theory that regulation was better for the public, that the public as a whole would be better served under such regulation than under the old system of unrestricted competition. Students of the subject have realized that men with money to invest will not invest in so strictly regulated enterprises unless there was some compensation for the rigid regulations. Students of the subject have also reached the conclusion that the public would be better served by regulation than by competition, that in the long run the public will be better served by a fewer number of successful utilities than by a larger number of unsuccessful ones. Legislatures, public utilities commissions and the courts have recognized the logic of this reasoning. This has led to the enactment of legislation requiring certificates of public necessity and convenience from commissions representing the public before a new utility company should enter the field already occupied by an old one performing the same service.

I have stated the two methods of dealing with the question: one, the old method of throwing the field open to competition, the other regulating even to the minutest detail the activities of these companies. As to which method is preferable, I express no opinion. That is not a question for this court. It belongs to another department of the State and I have no disposition to trench upon its prerogative. It has chosen the method of regulation, and courts must accept that decision as final and administer the law accordingly.

The courts which have dealt with the question now

before us have been unanimous in concluding that the commissions may take into consideration present transportation facilities in determining the question of whether the public convenience and necessity require transportation by auto bus and auto truck, because whether it be a steam road, an electric road, an auto bus or an auto truck, they are all selling the same commodity, *i. e.,* transportation.

I reach the decision I do because every decision of courts of last resort which I have been able to find so holds in considering the words here under discussion. The able counsel appearing in the case have cited us to no decision holding to the contrary and upon the argument, while not agreeing to the exact power of the commission, all conceded that the commission had misconceived its power.    Numerous decisions of public utilities commissions have also been cited to us, but not one has been cited which sustains the holding of the defendant.

The supreme court of Illinois has considered a like statute in two recent cases.    In *West Suburban Transp. Co.* v. *Railway Co.,* 140 N. E. 56, the court said:

"To authorize the commerce commission to grant appellant a certificate of convenience and necessity, and authority to operate its lines to serve the same public already served by an existing utility, it was required that it be shown the existing utility was not rendering adequate and convenient service, and that the operation of the bus line would eliminate such inadequacy and inconvenience.    In determining that question the primary consideration is the convenience and necessity of the public."

This case was followed by *Choate* v. *Illinois Commerce Commission,* 141 N. E. 12, in which the court fully reviews the facts and reverses the order of the commission granting the permit.    It was there said:

"The railroads in this country have kept pace with

the industrial development and the population increase, and the prosperity of the nation has been due to a large extent to the steady expansion of the transportation system. The savings of hundreds of thousands of investors have been massed to build our great net-work of railroads, and these transportation systems are entitled to protection from irresponsible competition. If shoestring transportation companies, with no money invested in right of way and no reserve capital to provide adequate service, or to protect the public from damage, are permitted to drop in here and there and take the cream of the transportation business from the permanent transportation systems, disastrous results are inevitable. If the permanent highways built at the expense of the people are destroyed, these irresponsible bus lines, that profess to serve the public convenience and to supply public necessity, will leave the public to walk or to provide other transportation facilities. Orders of the public authorities to furnish adequate transportation facilities would be unavailing, because the bus lines would be wholly incapable of complying with the order."

In *Re Application of Shelton Street Ry. Co.*, 69 Conn. 626 (38 Atl. 362), where the same words here involved were under consideration, it was said:

"So in the statute under consideration, the 'public convenience and necessity' sufficient to 'require the construction of such street railway,' means a condition existing at the time of the application, in respect to the applying railroad, the mode of public travel, the manner in which those needs are to be supplied, and the probable effect of the proposed road upon the whole question of adequately supplying those needs, as well as in respect to the road proposed to be paralleled, that, in the judgment of the trier, will justify the interference with private rights involved. Railroad companies chartered by the legislature have expended large sums of money in the construction of their roads, which are practically wasted unless the road can be used without loss for the transportation of passengers and freight. It is obviously for this reason that the provisions of section 8 were incorporated into the general act, and so a legal right given to existing roads

to protection against a certain kind of parallel road, when the circumstances of such road is not shown to be, under all the existing conditions, of public convenience and necessity. For the protection of such legal rights an existing road may apply to the courts."

The supreme court of Ohio has had these words before it, and in *Ashley Tri-County Mut. Tel. Co.* v. *Telephone Co.*, 92 Ohio St. 336 (110 N. E. 959), it was said:

"Public convenience is the polestar of the act, and an established and adequate service in a municipality or locality is the chief factor in its determination, and where, as here, these factors may be disturbed by a new and competitive telephone company, substantially affecting established service, it is necessary that a certificate be obtained, to the effect that the right or franchise is necessary for the public convenience, before such second company can exercise its rights and franchises in such occupied locality."

We have been cited by counsel to numerous opinions of commissions having to deal with this question. That of the New York commission in *Petition of Gray*, P. U. R. 1916A, 33, is nearer in accord with my views than any I have examined. It was rendered upon the first application to the commission under a similar statute to the one before us and quite fully reviews the facts which the commission deemed it its duty to consider. The decisions of the New York courts are not out of harmony with it.

I have noted that like words are used in our telephone act. If a new telephone company should ask for a certificate of public convenience and necessity to serve a field already served by another company, I entertain no doubt that the commission could consider the present telephone facilities in determining whether the certificate should issue. Our banking law (Act No. 379, Pub. Acts 1919 [Comp. Laws Supp. 1922, § 7973]) requires the commissioner of banking upon

application for a charter to conduct a bank to determine among other things the "necessity" for such new banking corporation.   May not the commissioner of banking in his investigation take into consideration the present banking facilities in the territory to be served?   I do not think there can be any doubt about the proposition.   We took this idea from Kansas which had a charter board to determine this question. The Kansas act was before the supreme court of that State in *Schaake* v. *Dolley*, 85. Kan. 598 (118 Pac. 80, 37 L. R. A. [N. S.] 877, Ann. Cas. 1913A, 254), and was fully considered in an exhaustive opinion, during the course of which it was said:

"The statute belongs to the well-known class in which the legislature prescribes a rule to be applied according to the existence or non-existence of some fact which the officer or board called upon to administer the law is required to ascertain.   The question for the charter board in any case arising under this law is, Are the banking facilities of the community adequate to the public needs?   This question is to be determined like any other question of fact, from a consideration of the conditions existing in the community concerned.   The board has no discretion over these conditions.   It does not create them and can not modify them.   It merely finds out and declares what they are, and the statute then dictates what shall be done."

I find nothing ambiguous in this statute.   The legislature used words of well defined meaning, particularly to those dealing with the regulation of public utilities, words which ought not to require extraneous research to discover their meaning.   I find nothing in the language of the act itself which limits the inquiry of the commission to one means of transportation.   My Brother holds that when one auto bus route has been established the commission may inquire as to whether the service is adequate before issuing another permit.   I find no language in the

act which would authorize the broadening of their inquiry on the second application. If they may inquire into this subject on the second application, I think they may on the first.

But if we are to extraneously search for the legislative intent, I do not think it necessary to go outside this record to discover the purpose of the legislature in enacting this law. This record discloses that in the last few years there has been expended by the State, its political subdivisions and its people approximately $130,000,000 in the improvement of its highways. The cost of maintenance alone runs into the millions each year. During the first seven months of this year licenses were issued by the secretary of State to the owners of 64,523 motor vehicles which use these highways as common carriers for commercial purposes. These rapidly driven automobiles and heavily ladened trucks are beyond question increasing the cost of maintenance of every mile of road they travel over. In a general way these facts were known to the legislature. The legislature no doubt entertained the view that these commercial motor vehicles should be permitted under proper regulations to continue the use of the highways when and where the public needs such service, but that when and where the public did not need such service and was adequately served by other transportation facilities that they should not be permitted the use of such highways at an increased cost to the taxpayer for their maintenance.

This record also discloses a bit of irony if my Brother's conclusion is sustained. Last year plaintiffs in certiorari paid in taxes for the building and maintaining of highways $4,941.96. They were not only required to maintain their own roadway but were required to pay this sum to furnish a roadway for their competitors without having a right to be heard

when the commission is acting under the provisions of this act. I can not bring myself to believe that it was the legislative intent to bring about such a result.

I think the order of the commission should be vacated and the case remanded for proceedings not inconsistent herewith.

WIEST, C. J., took no part in this decision.