# CHARLESTON.

Monongahela West Penn Public Service Company and Monongahela Transport Company *v.* The State Road Commission of West Virginia, Reynolds Taxi Company *et al.*

(No. 6005)

The Baltimore and Ohio Railroad Company and West Virginia Transportation Company *v.* The State Road Commission of West Virginia, Reynolds Taxi Company *et al.*

(No. 6006)

The Baltimore and Ohio Railroad Company and West Virginia Transportation Company *v.* The State Road Commission of West Virginia, Bartlett Brothers Bus Company *et al.*

(No. 6007)

Submitted September 7, 1927. Decided September 20, 1927.

1. Carriers—*Motorbus Permit May Not be Issued Except on Showing That Privilege is Necessary for Public Convenience and That Service is Not Being Adequately Performed (Acts 1925, c. 17, § 82).*

   Under Section 82, Chapter 17 of the Acts of the Legislature of 1925, no permit to operate motor vehicles for public transportation for hire shall be issued by the State Road Commission until it be established upon a proper investigation that the privilege so sought by the applicant is necessary or convenient for the public, and that the proposed service is not then being adequately performed by any other persons, partnership or corporation. (p. 192.)

   (Carriers, 10 C. J. § 1069.)

2. Same—*Public Utilities Should be Reasonably Protected From Detrimental Competition; Railroad Qualified to Render Service Should Ordinarily be Given Preference in Awarding Initial Permit for Motorbus Line Between Points on its Line (Acts 1925, c. 17, § 82).*

   The public policy of this State, as expressed in legislative enactments, requires that public utilities be given reasonable

protection from detrimental competition. Wherefore, when an existing carrier is one of several applicants for the initial permit to operate motor busses over a highway between points served by the railroad of the carrier, and it is fully qualified to render the additional service proposed, the State Road Commission should ordinarily give the preference to the carrier.   (p. 189.)

(Carriers, 10 C. J. § 1069.)

(Note: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Woods, Judge, dissenting.

Error to Circuit Court, Kanawha County.

Application by the Reynolds Taxi Company for certificate of convenience to operate motor vehicles for hire, opposed by the Monongahela West Penn Public Service Company and the Baltimore & Ohio Railroad Company, whose subsidiaries, the Monongahela Transport Company and the West Virginia Transportation Company also applied for similar certificates. Application by the Bartlett Bros. Bus Company for a certificate of convenience to operate motor vehicles for hire opposed by the Baltimore & Ohio Railroad Company, whose subsidiary, the West Virginia Transportation Company, applied for a similar certificate.   To review an order of the circuit court setting aside the order of the State Road Commission in each case and awarding certificates of convenience to the West Virginia Transportation Company, the State Road Commission and others bring error.

*Affirmed.*

*Howard B. Lee,* Attorney General, and *R. Dennis Steed,* for plaintiff in error State Road Commission.

*T. C. Townsend* and *E. G. Smith,* for plaintiff in error Reynolds Taxi Co.

*Guy H. Burnside* and *Lynch & Lynch,* for plaintiff in error Bartlett Bros. Bus Co.

*Poffenbarger, Blue & Dayton,* for West Virginia. Motor Transportation Association.

*Steptoe, Maxwell & Johnson; Meredith & Bell* and *Conley & Johnson,* for defendants in error.

Hatcher, President:

These cases are here on writs of error to judgments in *certiorari* of the circuit court of Kanawha county. The appellants heretofore challenged the jurisdiction of the circuit court herein, by separate petitions in prohibition filed in this Court. Our decision thereon was rendered February 8, 1927, and is reported in 136 S. E. 833. The history of the several proceedings to that date as stated there is for convenience copied here:

"The Monongahela West Penn Public Service Company owns and operates, as a public carrier in West Virginia, a system of electric railway lines. For the purpose of providing additional service and protecting itself from injurious competition by independent bus lines, it organized the Monongahela Transport Company to operate bus lines in territory served by its electric railway system. The Baltimore & Ohio Railroad Company, owning and operating steam railways as a public carrier in this state, for like reasons and purpose, organized the West Virginia Transportation Company.

"Upon application being made by the Reynolds Taxi Company for a certificate of convenience to operate motor vehicles carrying passengers for hire between Clarksburg and Buckhannon, by way of Jane Lew and Weston, the Monongahela West Penn Public Service Company and the Baltimore & Ohio Railroad Company filed protests thereto and caused their subsidiaries, Monongahela Transport Company and West Virginia Transportation Company, to apply for a certificate of convenience to operate motor vehicles carrying passengers for hire between Weston and Buckhannon. And, an application being made by Bartlett Bros. Bus Company for a certificate of convenience to operate motor vehicles carrying passengers for hire between Clarksburg and Grafton, the Baltimore & Ohio Railroad Company filed a protest thereto, and through its subsidiary, the West Virginia Transportation Company, applied for a similar certificate of convenience. After a full hearing the road commission granted the applications to the Rey-

nolds Taxi Company and the Bartlett Bros. Bus Company, and refused those of Monongahela Transport Company and the West Virginia Transportation Company. Thereafter the circuit court of Kanawha county, on application of Monongahela Transport Company, Baltimore & Ohio Railroad Company, and West Virginia Transportation Company awarded writs of *certiorari* to the rulings of the state road commission, and these proceedings followed."

Prohibition was denied, and the cases were heard by the circuit court. It set aside the order of the Commission in each case and awarded certificates of convenience to West Virginia Transportation Company over the routes from Weston to Buckhannon, and from Clarksburg to Grafton.

## PROCEDURE

The order of the Commission awarding the several certificates to the petitioners was entered on July 19, 1926. The applications for the writs of *certiorari* were made on August 6, 1926. During that interval the petitioners expended some time, labor and money in preparing to exercise their rights under the awards. They now contend that the failure of appellees "to disclose their intention to contest the Commission's orders and in delaying the filing of their petition" in the circuit court, is such laches as calls for reversal. The evidence shows, however, that appellees did not receive from the Commission notice of its rulings until August 2. A delay of only four days in preparing and filing the petitions herein was not unreasonable, and does not constitute laches.

Appellants also contend that the records of the commission's proceedings, which were before the circuit court, can not be considered, because they do not comply with Sec. 3, Ch. 110, Code, as construed in *Bee* v. *Seaman,* 36 W. Va. 381; *Cushwa* v. *Lamar,* 45 W. Va. 326, and other decisions of this Court; and because they do not purport to include such facts as the Commission may have obtained upon its own "proper investigation".

Certain exhibits were filed by these appellants in the prohibition cases, which their petitions averred were copies of the records in the several proceedings had before the Commission in which appellants were awarded the certificates under consideration. While the prohibition cases were pending here, the files of the Commission were destroyed by fire. In order to make as complete a return as possible to the writs of *certiorari* the Commission secured from this Court the very exhibits which appellants had filed in the prohibition cases, and tendered them to the circuit court as "complete records". The return did not allege that the Commission made any investigation not appearing in the records. It is those very records which appellants now seek to discredit.

After proffering those records in the prohibition proceedings the appellants will not be permitted to question them in these cases. "A party cannot either in the course of litigation or in dealings in *pais* occupy inconsistent positions. Upon that rule election is founded; 'a man shall not be allowed', in the language of the Scotch law, 'to approbate and reprobate'." Bigelow on Estoppel, 6th Ed. 732. "Parties will not be permitted to assume successive inconsistent positions in the course of a suit or series of suits in reference to the same fact or state of facts." *MacDonald* v. *Long*, 100 W. Va. 551.

## THE MERITS

Appellants contend in these cases as they did in the prohibition cases, that the sole power to grant or refuse certificates of convenience has been vested in the Commission by the Legislature. We decided in the prohibition cases that the rulings of the Commission herein were subject to judicial review. That decision is *res adjudicata* and further argument thereon is fruitless. Upon such review, Sec. 3, Ch. 110, Code, requires the circuit court to "determine all questions arising on the law and evidence and render such judgment or make such order upon the whole matter as law and justice may require." The plain language of the statute indubitably conferred upon the circuit court jurisdiction to make

the awards contained in its order without referring the cases back to the Commission.

Cases 6006 and 6007, respectively, involve simply a choice of applicants for the initial permit to operate a bus line. In each case both applicants are fully able to render adequate service to the public. In each case the Commission preferred the appellant, presumably because of priority of application, as the evidence discloses no other advantage over the other applicant. In each case the circuit court reversed the Commission and gave the preference to the appellee, presumably to safeguard a large railway investment along or near the route in question. Consequently, the single inquiry presented in each of these cases is, which applicant does law and justice favor.

Appellants assert that all property rights of a railroad are confined to its right of way; that its rights do not extend to parallel highways; and that it has no legal priority to pre-empt the field of motor bus transportation, to the exclusion of other applicants desiring to render like service. Appellants rely largely on *Charles River Bridge* v. *Warren Bridge,* 11 Peters 420, and kindred cases in support of their position. The gist of the *Bridge* case decision is that grants of privileges from a state are strictly construed; that nothing passes by implication; that a toll-bridge franchise, not made exclusive, will not be so construed, and that another bridge may thereafter be chartered in the same vicinity, impairing or even destroying the value of the first bridge.

That case was decided in 1837. Then "Competition is the life of trade" was accepted as a guiding maxim of economics. That maxim has long since been rejected so far as it applies to public utilities. Uncontrolled competition is now regarded as destructive of such utilities. In 1837 the state watched with indifference one public utility stifle another. Now the state controls its public utilities and as an incident to its regulatory power acknowledges a duty to protect them. As a part of that protection the state now guards against unnecessary duplication of public utilities. Consequently, the decision in the *Bridge* case is not applicable to cases like these, where regulated utilities are concerned.

The appellees make no claim to exclusive charter right or specific legal or statutory grant of priority of right to pre-empt bus service on our highways. Their position may be summarized as follows: The railroads perform certain vital services to the public which bus companies cannot perform, and therefore must be preserved; the railroads have large investments, and to make adequate returns thereon as well as to maintain their roads, equipment and service properly, need all the income available under present rates and conditions; competitive bus companies will divert a material amount of travel from the railroads, thereby diminishing the revenues of the latter; reduced revenues will necessarily cause one of two things, (a) rates will be raised to meet the loss thus occasioned, or (b) the efficiency of railroad service will be impaired; either contingency will seriously affect the general travelling public; but these contingencies may be avoided by permitting the railroads or their subsidiaries to render and receive the emoluments from the bus service, which would otherwise be competitive; because of greater resources the railroads afford greater security to the public in performing bus service than that offered by the ordinary bus companies; and the interests of the public will therefore be better served by giving the existing carriers the preference over other applicants for certificates of convenience.

The argument of the railroads has met the approval of Court and Commission. "Railroads have permanent road-beds and trackage which require an outlay of millions of dollars and which in turn yield large revenue to the people of the State. The average bus line is incorporated for a comparatively small sum. The railroad is of vastly greater financial responsibility. This is a matter of substantial public interest, particularly in cases of accident. It is the established policy of the law in this State that a public utility be allowed to earn a fair return on its investment. It is therefore not only unjust but poor economy to grant to a much less responsible utility company the right to compete for the business of carrying passengers by parallelling its line unless it appears that the necessary service cannot be furnished by such railroad. Appellants offer to provide what-

ever increase in accommodations and service is deemed essential to meet the public convenience and necessity. It is but consonant with our law regulating public utilities that they be given an opportunity to do so." *Egyptian Trans. System* v. *L. & N. R. R. Co.*, 321 Ill. 588. In accord therewith are the following Commission decisions: *Washington R. R. & E. Co.* v. *Transit Co.* (Dist. of Col.), P. U. R. 1922 C. 754, *Re Blue and Gray Bus Line* (Utah), P. U. R. 1924 A. 449, (which goes so far as to yield to railroads a "natural preferential right to extend service instead of permitting competition by an auto bus company); *Re United Stages* (Cal.) 1924 D. P. U. R. 762; *Re Wentworth* (N. H.) Order No. 1759, Dec. 22, 1925; *Re Maine Motor Coaches Inc.* (Me.) P. U. R. 1926 B 545, (Citing decisions from the Commissions of 27 states as "in harmony" with the conclusion reached in that case.) The foregoing decisions are only one step in advance of, and are the logical conclusion to the masterly opinion written by Judge MILLER in *Power Company* v. *Calloway*, 99 W. Va. 157 (163), wherein he declares the policy of this State in regard to railroads:

> "The policy of the state as evidenced by the road law and of the statutes relating to the public service commission, its powers and duties, is not to invite or encourage ruinous competition between public carriers; on the contrary its policy is to protect such public servants in the enjoyment of their rights, so that the public may be served most efficiently and economically, and by the best equipment reasonably necessary therein. As illustrative of the application of this power respecting public carriers, see *Chesapeake & Ohio Ry. Co.* v. *Pub. Ser. Com.*, 75 W. Va. 100, Id. 78 W. Va. 667.
>
> "With the burden and duty thus imposed upon a carrier and the public control thereof established by law, is not the state under the moral, if not the legal obligation, to give reasonable protection, consistent with the public weal, to the rights and franchises of such public service corporations? We think it is. As evidence of the protection which the state intended giving public carriers with permits under the state road law, the Act of

> 1923, amending the law of 1921, provides that no
> such permit shall be issued until it shall be estab-
> lished to the satisfaction of the commissioners
> that the privilege, etc., is necessary or convenient
> for the public, and that this service, etc., is not
> being adequately performed by *any other person.*
> Observe also to what extent the law protects estab-
> lished ferries and toll bridges, and provides against
> the incursion of unauthorized and ruinous oppo-
> sition by unlicensed persons.   Chapter 44, Barnes'
> Code 1923.   All this is in the public interest; for
> unless those with licensed authority are so pro-
> tected in the reasonable exercise of their rights,
> they can not live to serve the public well and effi-
> ciently.''

Priority of time in application, while an element to be considered, is not ordinarily of sufficient importance to control the granting of a certificate.   *Chicago Motor Co.* v. *Chicago Stage Co.*, 287 Ill. 320, 122 N. W. 477.   Law and justice require that mere priority of application should yield to the graver element of public policy, and we so hold in these cases.

*Warren-Salem Coach Line Co.* v. *Commission*, (Ohio) 156 N. E. 453, and *Norfolk Southern Ry. Co.* v. *Commonwealth,* 141 Va. 179, 126 S. E. 82, are cited by appellants as presenting facts similar to, and as supporting their contentions in the instant cases.   Those cases, however, did not involve a choice of applicants for the same service.   In each case it was determined that the existing service was not adequate and that an additional service was needed.   In neither case did the existing carrier seek permission to perform that additional service.   Each case rightly makes the public convenience and necessity paramount to the interest of the utility.   Neither case is in conflict with our decision here.   On the contrary, point 4 of the syllabus of the *Virginia* case supports it:   ''Upon application by a motor vehicle carrier for a certificate of convenience and necessity, existing transportation systems should be protected so far as compatible with the public interest.''

Case No. 6005 involves the cancellation by the circuit court of the certificate of convenience issued to the Reynolds Taxi

Company over the route between Clarksburg and Weston. The evidence shows that eighteen electric cars and three railway trains operate daily each way between these two points. R. T. Reynolds, the chief witness for the Taxi Company, stated that there were forty-two families between Gusman's Bridge and Deanville (two intermediate points between Clarksburg and Weston), that do not reside close to either a railroad or traction stop. In commenting on the general service of the electric cars, between the terminal points, the witness made this admission: "I know they give them hourly service, and pretty good service I call it, whether adequate service or not I am not in position to know". Before such a certificate shall be issued the statute requires it to be established that the privilege sought is necessary or convenient for the public, and that the service so proposed is not being adequately performed by another. Courts and Commissions construing statutes similar to ours have uniformly held that the necessity and convenience referred to is that of the public generally as distinguished from that of a number of individuals or a community, and that the inadequacy of the existing service and the convenience or necessity of the proposed service must both affirmatively appear from the evidence. *Choate* v. *Commission,* 309 Ill. 248; *McLain* v. *Commission,* 110 Ohio St. 1; *Re Motor Transit Co.* (Cal.) P. U. R. 1922 D. 495; *Re Jitney Applications* (R. I.) P. U. R. 1922 E. 612; *Re Paradox Co.* (Col.) P. U. R. 1923 E. 759; *Re Alabama Power Co.* (Ala.) P. U. R. 1923 E. 828 (832); *Re Branham* (Ariz.) P. U. R. 1924 C. 500; *Re United Stages* (Cal.) P. U. R. 1925 A. 688. The record discloses no demand for additional carrier service between Clarksburg and Weston either by the general public or by the Gusman's Bridge-Deanville segment. It fails to establish as an evidential fact that the existing carriers do not serve *the general public* adequately. It therefore does not justify the granting of a certificate of convenience between Clarksburg and Weston, and the cancellation of the certificate by the circuit court was proper.

The decision in cases 6006 and 6007 applies only to a choice of applicants for a permit over a bus route about to be established. It has no reference to a case where a rail-

road or street car company is an applicant for permission to operate motor vehicles over an established bus route. The holder of the permit over the established route is entitled to the same protection and consideration as any other public utility.

The order of the circuit court in each case will be

*Affirmed.*

Woods, J. (dissenting): When the parties to these appeals were before this court in prohibition, I dissented from the holding of my associates on the ground that the statute vesting in the Road Commission the power of granting certificates of convenience was not subject to review—the act being governmental in its nature and not judicial. Nor was I able to agree to the doctrine there announced that existing carriers by rail possess a property right to be considered in their favor over other applicants for certificates of convenience. As I view it, there is no express or implied legislative policy in this state which gives support to that doctrine.

Whether the Court has jurisdiction to review the action of the Road Commission in granting certificates of convenience, is now water over the wheel. So I will simply re-affirm my belief in the soundness of my original view on that question and confine this note to the question of whether there is a property right in the existing rail carriers to a right of priority in favor of them over other applicants for bus service, on hearing by the commission for the purpose of granting certificates of convenience. The language of the statute regulating the issuance of certificates of convenience limits the commission to the inquiry whether the service proposed to be rendered by the applicant is "necessary or convenient for the public" and whether it is being "adequately performed at the time of such application by any other person, partnership or corporation." The Supreme Court of Michigan, in *Rapid Railway Co.* v. *Michigan Public Utilities Commission*, 225 Mich. 425, 196 N. W. 518, expressly held that the commission, in passing on applications for permission to engage in the business of transporting passengers in motor vehicles between certain points, providing for the issuance

of such permit in accordance with public convenience and necessity, cannot consider other transportation facilities, such as railroads, in passing on question of convenience and necessity, but must limit inquiry to the motor vehicle business. The following excerpts from the Court's opinion is apropos to the situation in this state: ''The grant of the power to determine whether, in view of the service rendered by other means of transportation, a necessity exists, or the public convenience requires, that a new system of transportation should not be permitted in competition with those operating between certain points, should not be inferred unless the language is fairly expressive of such an intent on the part of the Legislature. This is an age of evolution in the transportation business. Steam railroads service greatly reduced the earnings of the vessels carrying passengers and freight, and put the stagecoach out of business. Electric cars have much affected the business of the steam roads between certain points. The use of motor vehicles will doubtless decrease the earnings of the electric roads. If it be desirable to clothe the commission with the power to prevent such competition by refusing to permit motor vehicles to operate, when the service rendered by the steam and electric roads is adequate to the needs and convenience of the public, we think the Legislature should so provide in no uncertain language.''

The purpose of our statute, as disclosed by its title, is to regulate the use of such motor vehicles on the highways. I find no intention in its language to do more than this. Our Legislature sought to restrict the number of motor vehicles using the highways for the conveyance of persons and property for hire by imposing a privilege tax on them, and required a finding by the Road Commission of the public convenience and necessity—thus empowering said commission in the public interest to determine the number of persons, firms, or corporations who should be permitted to so operate. A sound policy is thus disclosed of the state demanding, as the first consideration, adequacy of service of the traveling public, rather than the protection of carriers by rail against motorbus carriers. In *McLain* v. *Utilities Commission*, 110 Ohio St. 1, 143 N. E. 381, which involved a construction of

the Ohio act of 1923 (110 Ohio Laws, p. 211), requiring certificates of convenience of motor vehicle transportation, the court said: "Nor do we concur in the view of those courts who have expressed the view that any public utility requirement has for its purpose 'the establishment of a policy of protecting existing railroad transportation as against motor transport interest.' Nor, indeed, do we concur in any policy of protecting any existing public utility against competing public utilities, but consider rather that it is the policy of the federal government and the government of the various states by legislation to secure to the general public, through Public Utility Commissions, or similar administrative bodies, adequate service from public utilities, which of course includes price, character of service, and continuity, that regulation through commissions is for the purpose of accomplishing the ultimate object, adequate service, and that the benefits, if any, by way of restricted competition, etc., which inure to established public utilities, are incidental to such regulation, but not its object or purpose."

The Supreme Court of Virginia has recently decided in accord with the view expressed by the Ohio court. *Norfolk Southern Railroad Co.* v. *Commonwealth,* 141 Va. 179, 126 S. E. 82. The service rendered by a new means of transportation frequently is so different from the existing means of transportation that it can be considered only incidentally competitive with it. It was thus when the railroads supplanted the stagecoach; the traction system, the railroad; and now the motorbus, the field of its predecessors.

This Court, in *Carson* v. *Woodram,* 95 W. Va. 197, 120 S. E. 512, in construing that portion of the statute which requires a certificate of convenience, held that persons operating automobiles under such license or permit for the carriage of passengers for hire over public highways between fixed termini may enjoin others without such license or permit from engaging in a like service. In *Quesenberry* v. *Road Commission,* 103 W. Va. 714, 138 S. E. 362, this Court expressly held that the action of the commission is ministerial and administrative, and does not come within the realm of the judiciary only where the granting or the refusing of the

certificate of convenience affects a right of property of existing carriers. I am in accord with that view aside from the limitation. *Princeton Power Co.* v. *Calloway*, 99 W. Va. 157, 128 S. E. 89, cited to support the doctrine announced in the prohibition proceeding involving the parties to this appeal, held that the *illegal* operation of motor vehicles for compensation between fixed termini may be enjoined by a paralleling carrier by rail, and that the injunction in favor of the traction company would remain in force only until the operators of such motor vehicles "shall have acquired authority and have qualified * * * in the manner provided by law" for the operation of their motor vehicles over the route and between the termini in question. Instead of being an argument in favor of the doctrine announced that existing railroads had a prior right to be considered on application for motorbus transportation over other applicants, the question submitted considered and determined in that case argues strongly to the contrary.

The Illinois Supreme Court, in *Egyptian Transportation System* v. *Railroad Co.*, 321 Ill. 580, 152 N. E. 510, is relied on in the opinion of this Court to sustain the position that, before a competing utility is allowed to parallel existing rail lines and take their business from them, said rail carriers should be given the opportunity to supply all needed service. However, this case is robbed somewhat of its value as a precedent governing here by the same court in the later case of *Bartonville Bus Line* v. *Eagle Motor Coach Line*, 326 Ill. 200, 157 N. E. 175, wherein it is stated that in the former case the decision was based on a policy of the state "established by legislation." As we have shown, there is no such legislative policy, either express or plainly implied, in our state. In the *Bartonville Bus Line* case, the Illinois court modified its former decision in the *Egyptian* case by expressly holding that, while priority in the field is an element to be considered, it will not of itself govern the granting of a certificate of convenience and necessity for the operation of a motorbus line. It will be noted also that the state of Illinois has unified control over all public utilities in its "Commerce Commission", and it is provided in that state

that *no public utility* will be permitted to enter upon any new proposed service until it shall have obtained from the commission a certificate that public convenience and necessity require it.   This is the case in quite a number of other states of the Union.   So, before fastening upon decisions from any of those states as authorities in determining the public policy of our state, as expressed in legislative enactments, we must take into consideration the fact that our Legislature has seen fit to create a "Road Commission" in addition to the already existing Public Service Commission, and has endowed the former with power to pass upon the necessity of proposed bus lines between designated points and to issue certificates of convenience, if they deem the same "necessary or convenient for the public, and that the *service so proposed* to be rendered", etc.   It is an attempt on the part of the state to control its highways, so that there may be ordered and regulated bus service over the same as among bus lines, and it excludes the idea of a legislative intent to establish a right of priority in favor of existing carriers by rail.

Even though it be admitted that the defendants in error have a right of priority to pre-empt the field of motorbus service, that right does not necessarily extend to their subsidiaries.   These subsidiaries are separate and distinct corporate entities, possessing their own rights, powers and duties. While the rail carriers perform their services under the limitation of their charters (transportation by rail), their subsidiaries only perform such service as they may obtain from the statute governing motorbus transportation.   Such subsidiaries stand in the position of the ordinary applicant for a certificate of convenience.   "The use of the highways for the public transportation of freight and passengers belongs to the public.   This use may therefore be completely regulated and controlled by the Legislature in the interest of the public welfare," says this Court in *Carson* v. *Woodram, supra*.   There being no express or implied legislative policy in this state to support the doctrine of a property right in the railroad to priority over other competitors in motorbus transportation, the holding of this Court in the several prohibition cases, and in the present cases, is an invasion of the legislative field.      104 W. Va.