CHARLESTON TRANSIT CO.

v.

PUBLIC SERVICE COMMISSION, *etc.*

(No. 10875)

Submitted April 25, 1957. Decided June 4, 1957.

*Spilman, Thomas, Battle & Klostermeyer, Howard R. Klostermeyer, Frederick H. Klostermeyer,* for petitioner.

*W. W. Barron,* Attorney General, *Clement R. Bassett,* Assistant Attorney General, *John C. White, Chas. E. Mahan,* for respondents.

BROWNING, JUDGE:

Charleston Transit Company, hereinafter referred to as Charleston, appeals from an order of the Public Ser-

vice Commission removing certain restrictions from the operating certificates issued to Tyler Mountain Bus Line, hereinafter designated as Tyler.

Tyler operates a bus line between terminals on Summers Street in Charleston and 21st Street in Nitro. The certificated route goes from Charleston to Lock Six, thence over Big Tyler Mountain to the vicinity known as Cross Lanes, then to Nitro, entering the Nitro city limits at 40th Street. Previous to the instant order, Tyler was restricted to the transportation of passengers whose point of origin or destination was between Lock Six and the Nitro city limits, or 40th Street. Thus passengers who resided in Nitro, boarding the bus in Charleston, were forced to debark at 40th Street, even though the bus upon which they were riding continued on to the terminal at 21st Street. Conversely, passengers boarding the bus between 21st Street and 40th Street in Nitro were forced to debark at Lock Six, approximately five miles from Charleston, though the bus would continue on to Summers Street in Charleston.

Tyler operates nineteen round trips, or thirty-eight one way trips, each day, and did not observe the restriction until August, 1955, when the Public Service Commission issued a cease and desist order upon complaint of Charleston.

Charleston also operates nineteen round trips each day and, under its authorization, is entitled to transport passengers between points in Charleston to points within the city limits of Nitro. The certificated route of Charleston is the same as Tyler's to Lock Six, then with the Kanawha River to Dunbar, Institute, Sattes, across the river to St. Albans, then recrosses the river into Nitro, and proceeds the length thereof. Between Lock Six and 40th Street, the routes of Charleston and Tyler vary from two to six miles apart.

Tyler applied for removal of the restriction, and authority to operate over the full length of 2nd Avenue in Nitro on March 14, 1956. Charleston and Atlantic Greyhound

protested the removal and a hearing was held on April 18, 1956. Atlantic Greyhound operates five westbound trips from Charleston to Nitro, and four eastbound from Nitro to Charleston each day, with authority to transport passengers between the two cities over the same route as Charleston.

At the hearing, Staunton C. Edds, doing business as Tyler, testified that: Since the cease and desist order of August, 1955, Tyler has lost $50.00 a day in gross revenue; such loss would not result in a similar increase in the revenues of Charleston or Greyhound because the majority of such passengers have simply ceased coming to Charleston as too inconvenient, or found private means of transportation; the enforcement of the restriction is impractical, if not almost impossible, and imposes an undue hardship upon the drivers; the enforcement of the restriction is resulting in numerous complaints, and ill will against Tyler; and if forced to continue to operate under the restriction it will be necessary to curtail service nearly fifty per cent. Seven witnesses testified in support of Tyler. Though testifying as private individuals, they were: The President of the Nitro Lions Club; housewife; Principal of Nitro High School; Post Office clerk and part time newspaper reporter; the manager of a Charleston dress shop, a resident of Nitro; the Mayor of Nitro; and the retired Fire Chief of American Viscose Corporation.

All of these witnesses testified as to the close social and economic ties binding the people of Nitro and the residents of Cross Lanes and Big Tyler Mountain area. The school children of the Cross Lanes and Tyler Mountain area attend Nitro High School. All testified as to complaints from fellow citizens of Nitro and expressed the preference of such citizens for Tyler as against Charleston. They testified that Charleston took ten minutes longer to make the trip and was generally more crowded; that there is an eighteen cents differential between Charleston and Tyler on round trips; and that their friends, relatives and acquaintances, whom they

wished to meet on the bus and journey to Charleston for shopping, medical and dental appointments, or other business, resided in the Cross Lanes—Tyler Mountain area. As heretofore stated, the children of the Cross Lanes—Tyler Mountain area attend Nitro High School, and, in order to join their parents and travel together on a necessary trip to Charleston, must, under the restriction, debark from the bus at an intermediate point between 40th Street and Lock Six and wait for the next bus, a delay of approximately one hour. Any curtailment of present service would be an additional grievance.

Charleston and Greyhound adduced testimony that: Their fares were 44¢ and 30¢ respectively; their overall systems were running at a loss; there were, on an average, numerous vacant seats on their present schedules; their revenues were not broken down to reflect any increase in revenues as a result of the cease and desist order; and that, should the Public Service Commission find any inadequacy in their present service, they were ready and willing to supply any additional service deemed necessary. Charleston also adduced testimony that it had formerly operated direct service between Charleston and Nitro, that is, omitting the river crossing into St. Albans, but that such had been discontinued in August, 1954, with the approval of the Public Service Commission, because the passenger load was very small, and that no complaints had been received regarding such discontinuance.

As heretofore stated, the Public Service Commission ordered the restriction deleted from the certificates of Tyler, and, also, authorized full operation of Tyler over 2nd Avenue in Nitro. Chairman Hanna dissented from that part of the order authorizing full operation over 2nd Avenue. Counsel for all interested parties orally informed the Court during the argument of this case that the question of Tyler picking up passengers and discharging within the city limits of Nitro and on 2nd Avenue had been amicably settled. However, the decision of this Court upon the primary issues makes that question moot.

A new factual situation is presented by this record in that the routes of Charleston and Tyler are over the same highway for approximately five or six miles from the City of Charleston to Lock Six, at which point Charleston continues directly west to Nitro, whereas Tyler turns away at that point from the common route and traverses other highways approximately eleven miles to enter the City of Nitro from the west. A new question of law is also presented in that heretofore this Court has not passed upon the issue of whether the provisions of Chapter 24A, Article 2, Section 5(a), as amended, apply where a restriction is lifted from the certificate of a common carrier in the same manner as it applies where a new certificate is sought. The Section reads as follows: "It shall be unlawful for any common carrier by motor vehicle to operate within this State without first having obtained from the commission a certificate of convenience and necessity. Upon the filing of an application for such certificate and after hearing thereon, if the commission finds from the evidence that the public convenience and necessity require the proposed service or any part thereof, it shall issue the certificate as prayed for, or issue it for the partial exercise only of the privilege sought, and may attach to the exercise of the right granted by such certificate such terms and conditions as in its judgment the public convenience and necessity may require, and if the commission shall be of the opinion that the service rendered by any common carrier holding a certificate of convenience and necessity over any route or routes in this State is in any respect inadequate or insufficient to meet the public needs, such certificate holder shall be given reasonable time and opportunity to remedy such inadequacy or insufficiency before any certificate shall be granted to an applicant proposing to operate over such route or routes as a common carrier. Before granting a certificate to a common carrier by motor vehicle the commission shall take into consideration existing transportation facilites in the territory for which a certificate is sought, and in case it finds from the evidence that the service furnished by existing

transportation facilities is reasonably efficient and adequate, the commission shall not grant such certificate."

In *Atlantic Greyhound Corporation* v. *Commission*, 132 W. Va. 650, 54 S. E. 2d. 169, the Public Service Commission granted a certificate of convenience and necessity to the Elk River Bus Company for authority to operate over U. S. Route 119 between Charleston and Clendenin, and over certain other roads leading to Route 119, giving to persons residing on such feeder roads bus service which they did not receive from any other certificated bus line. The Atlantic Greyhound, however, did operate over U. S. Route 119 to Clendenin and beyond to Clarksburg, a distance of 160 miles from Charleston. The two lines would have competed for business without restriction over approximately 13½ miles of U. S. Route 119 between Charleston and Clendenin. This Court reversed the order of the Commission and found that under the provisions of Chapter 24A, Article 2, Section 5(a), the new certificate could not be issued to Elk River Bus Company until Greyhound had been given an opportunity to remedy any inadequacy of service that was shown to exist. Two of the Judges of this Court dissented from that decision primarily for the reason that the competition which Elk River Bus Company would provide for Greyhound in the comparatively short distance between Charleston and Clendenin was negligible, and that the people living on the side roads should have the benefit of the service which the new company proposed.

It must be observed from the record in this case that if the restrictions on Tyler were not lifted no person living along the routes in question would be denied bus service, although the convenience of it might be enhanced as has been observed by resume of the evidence.

In *Reynolds Transportation Company* v. *Public Service Commission*, 125 W. Va. 690, 26 S. E. 2d. 519, the Commission granted a certificate to Reynolds to carry passengers by bus between Parsons and Elkins. The Commission granted Meyer a certificate to pick up passengers

east of Parsons and carry them to Elkins, or points between, and to pick up passengers between Parsons and Elkins if their destination was east of Parsons. It was argued forcefully in that case that this was a service not being rendered by Reynolds, and that if Meyer were required to force passengers, whose destination was beyond that point, to disembark at Parsons, it would cause delay in waiting for another bus, whereas, the Meyer bus was proceeding at once to the destination of such passengers. Again the Commission was reversed by this Court, and it was held that the provisions of Chapter 24A, Article 2, Section 5(a), were applicable. There was a dissent in this case also upon the ground that Reynolds should not have the right to monopolize the business of transporting passengers between the Towns of Elkins and Parsons unless the journey lies entirely between those or intermediate points. It would appear that the facts in this case are such as to eliminate the reason for the dissent in that case. In the opinion of the Court in the *Reynolds* case, it was said: "It is said that Meyer performs a service which Reynolds cannot perform for the reason that its lines stop at Parsons, and it can neither transport persons beyond Parsons and to the east, or go beyond Parsons and pick up passengers for transport to Elkins or other points west of Parsons. This, of course, is true, but if that be an argument for the proposition that the Meyer service should be extended into Elkins, why, on the other hand, should not Reynolds be permitted to extend its operations to Thomas or points beyond? True, Reynolds has not applied for this right, but if we grant the same character of right to Meyer, how could we refuse it as to Reynolds, should it hereafter apply therefor? Thus would be laid the foundation for continued raids by one transportation company upon the territory of another, and we do not think the public service will be promoted by such policy." Actually the only question presented upon this appeal is whether Tyler would, by having the restrictions which are now imposed upon it lifted, operate in direct competition with Charleston and Greyhound in

transporting passengers from Charleston to Nitro and from Nitro to Charleston. The people who live between Lock Six and the city limits of Nitro may travel by Tyler directly to the City of Charleston, or directly to the center of the City of Nitro. This Court is constrained to hold that the lifting of these restrictions upon Tyler's certificate is tantamount to and identical with the granting of similar privileges to a new applicant, and that under the provisions of Chapter 24A, Article 2, Section 5(a), this cannot be done unless such order is predicated upon a finding that the service furnished by existing transportation facilities is not reasonably efficient and adequate. Furthermore, even if such were found to be true, Charleston would have to be given reasonable time and opportunity to remedy the inadequacy or insufficiency of service before the restrictions could be lifted.

In the *Atlantic Greyhound* case, *supra*, the fourth syllabus point thereof quotes with approval Pt. 2, Syllabus, *McKee* v. *Public Service Commission*, 124 W. Va. 10, 18 S. E. 2d. 577, to this effect: "Where, under subsection (a), section 5, article 2, chapter 86, Acts of the Legislature, 1939, a certificate of convenience and necescity is granted a common carrier, to operate over a designated route or routes, regular or irregular, no additional certificate may be granted covering such route or routes, unless the service furnished under the first certificate is found, by the Public Service Commission, to be inadequate or insufficient, and the holder of such certificate first given an opportunity to remedy such service within a reasonable time after such finding."

While the lifting of the restrictions upon Tyler would, as shown by the evidence of seven witnesses, be of convenience to those persons, and perhaps to others similarly situate, the test is not the convenience of a few people in the community. The law provides that there must be "convenience *and* necessity" not "convenience *or* necessity", the language being conjunctive not disjunctive. In considering this question, Chapter 24A, Article 1, Section 1, must not be overlooked. It reads in part as follows: "* * * the duty to supervise and regulate * * * so as to:

(a) protect the safety and welfare of the traveling and shipping public in their use of transportation agencies by motor vehicle; (b) preserve, foster, and regulate transportation and permit the coordination of transportation facilities; (c) provide the traveling and shipping public transportation agencies rendering stabilized service at just and reasonable rates. * * *" While the convenience of the public is the paramount consideration of the law, if it is accompanied by necessity, this Court has always recognized that an incident to the regulation of a public monopoly is the protection of a certificate holder against unnecessary duplication or competition. *B. & O. Ry. Co.* v. *Road Commission,* 104 W. Va. 183, 139 S. E. 744. In *Reynolds Taxi Co.* v. *Hudson,* 103 W. Va. 173, 136 S. E. 833, this Court, quoting from *Power Co.* v. *Calloway,* 99 W. Va. 157, 163, 128 S. E. 89, said: "The policy of the State as evidenced by the road law and of the statutes relating to the public service commission, its powers and duties, is not to invite or encourage ruinous competition between public carriers; on the contrary its policy is to protect such public servants in the enjoyment of their rights, so that the public may be served most efficiently and economically, and by the best equipment reasonably necessary therein."

The facts here present a typical case where two private companies are engaged in the transportation of passengers, both having a monopoly, and thereby submitting to regulations as to rates, et cetera, but nevertheless competing with each other, indirectly at least. It is inevitable that competitive enterprise, within the framework of public monopoly, will sometimes create hardships. When we look to the record, however, it is apparent that Edds understood the limits of Tyler's operation at the time he purchased the bus line from his predecessors. A colloquy between him and Judge Nethken, then Chairman of the Public Service Commission, on the request for approval of the transfer of the certificates, leaves no doubt of this. Judge Nethken carefully informed him of the limitations, and admonished him to refrain from violat-

ing them, as apparently his predecessor had been doing, and promises to do so were given. However, the record shows that they were promptly broken, and that the present owner of Tyler operated against the restrictions of his certificate in carrying passengers directly from Nitro to Charleston, and vice versa, until restrained from further doing so by an order of the Commission, whereupon this application was filed to remove the restrictions. The final order of the Commission, not being supported by the evidence and based upon a mistake of law, must be reversed. The 3rd Syllabus Point in the *Greyhound* case states: "A final order of the Public Service Commission, based upon findings not supported by evidence, or based upon a mistake of law, will be reversed and set aside by this Court upon review."

The order of the Public Service Commission lifting the restrictions of Tyler is set aside and annulled.

*Reversed and remanded.*