UNITED FUEL GAS COMPANY

*v.*

THE PUBLIC SERVICE COMMISSION OF WEST VIRGINIA

(No. 10794)

Submitted September 25, 1956. Decided July 5, 1957.

*Charles C. Wise, Jr., R. K. Talbott, Tilford A. Jones,* for petitioner.

*John G. Fox,* Attorney General, *Fred H. Caplan,* Assistant Attorney General, for respondent.

HAYMOND, JUDGE:

This proceeding is before this Court upon the petition of United Fuel Gas Company, a public service corporation, filed September 26, 1955, pursuant to Section 1, Article 5, Chapter 24, Code, 1931, for review of a final order entered by the defendant, The Public Service Commission of West Virginia, August 26, 1955, which found that the existing rates for the intrastate gas service rendered by the petitioner in West Virginia were inadequate and prescribed new rates which would increase the existing annual rates by $565,283.00 which amount was increased by an additional $16,000.00 by supplementary order of the commission entered September 8, 1955. By those orders the total increase allowed amounted to $581,283.00.

On July 20, 1954, the petitioner instituted this proceeding before The Public Service Commission of West Virginia, sometimes referred to as the commission, by filing its application for authority to put into effect new rates for the intrastate gas service rendered by the petitioner in West Virginia. By its application the petitioner asserted that the existing rates charged for its intrastate gas business in West Virginia were inadequate to the extent of approximately $2,283,000.00 in annual revenue. The test period involved for the determination of just and reasonable rates for the intrastate gas service rendered by the petitioner was the period from July 1, 1953 to June 30, 1954. Numerous hearings were held from time to time by the commission until June 21, 1955, when the last hearing occurred.

The final order of the commission was concurred in by two of its members and one member dissented.

The petitioner, upon this review, which was granted by this Court January 23, 1956, asserts that the final order

entered by the commission August 26, 1955, supplemented by its order entered September 8, 1955, is violative of the provisions of the Constitution of the United States and of the Constitution of the State of West Virginia.

The proceeding was first submitted for decision April 10, 1956. On June 29, 1956, this Court ordered reargument and resubmission of the proceeding and it was continued until September 25, 1956. On September 26, 1956, the proceeding was finally submitted for decision upon the petition, the papers, documents, evidence, records and exhibits introduced before the commission, the statement of the commission of its reasons for the entry of the orders of August 26, 1955 and September 8, 1955, and the oral arguments and briefs of counsel in behalf of the petitioner and the commission.

By its assignments of error the petitioner seeks reversal of the final order of the commission on these grounds: (1) The final order is without evidence to support it, is contrary to the evidence, and for those reasons is arbitrary and violative of the due process clauses of the Constitution of the United States and the Constitution of West Virginia; (2) it obstructs and burdens interstate commerce in violation of the Constitution of the United States by giving West Virginia consumers of the gas furnished by the petitioner an unlawful preference over the consumers of its gas in other states; and (3) it results in the confiscation of the property of the petitioner without just compensation in violation of the Constitution of the United States and the Constitution of the State of West Virginia.

The controlling question involved in this proceeding upon review of the final order of the commission is whether by that order the petitioner is denied its right to recover from its West Virginia gas consumers the just and proper proportion of the total cost of the service provided by the company. There is no contention that the service provided is in any wise inadequate or that the petitioner has failed to meet in any substantial measure the demands of any of its consumers of gas in West Virginia.

There is, however, disagreement between the petitioner and the commission concerning the valuation of the property of the petitioner in its entire system for the purpose of determining the rates to be charged by the petitioner. The petitioner contends that it should be allowed to earn a return on its net original cost rate base on June 30, 1954, the end of the test period, of $112,792,408.00, instead of the average net original cost rate base during the test period July 1, 1953 to June 30, 1954 of $111,774,095.00 which was adopted by the commission, and the difference between the valuation for which the company contends and the valuation recognized by the commission is $1,018,313.00. Upon this review, however, the petitioner does not challenge the total valuation of $111,774,095.00 placed upon its property by the commission for the purpose of determining proper rates; and as there is a conflict in the evidence on that point the total valuation of $111,774,095.00 will be considered as correct and proper on this review of the final order of the commission.

About the year 1903 the petitioner became a West Virginia corporation and was organized for the purpose of obtaining additional supplies of gas for markets in Ohio. In 1909 it acquired large gas reserves and properties in West Virginia and Kentucky and at that time assumed obligations under an earlier contract which required it to use certain gas reserves in West Virginia to supply markets centered in Cincinnati, Ohio, and Covington, Kentucky. In the performance of that contract it constructed facilities to transport gas produced in West Virginia to the Cincinnati area and those facilities without change of location have since been used continuously for that purpose. In 1910 the petitioner entered into a contract with a predecessor of Ohio Fuel Gas Company to deliver gas produced in West Virginia to that company at the Ohio River near Ravenswood and gas from West Virginia is delivered to the Ohio Fuel Gas Company at that point by facilities constructed and maintained in accordance with that contract. The petitioner has furnished gas to Portsmouth Gas Company in Ohio since 1909; to Central

Kentucky Natural Gas Company for markets in and around Lexington, Kentucky, since 1912, and for markets in and around Cincinnati, Ohio, since 1910; to Manufacturers Light and Heat Company since 1927; and to Atlantic Seaboard Corporation, an affiliate of the Columbia Gas System, since 1932.

From the foregoing undisputed facts it is clear that the petitioner, since its organization, has been primarily interested in the sale of natural gas to interstate markets; that its present interstate customers have been such for many years; that no new interstate customer has been added since 1932; that from 1909 to 1944 the interstate market and the West Virginia market were supplied with gas produced and purchased in West Virginia and Kentucky; and that since 1944 the petitioner has supplied these markets with gas produced or purchased in West Virginia, Kentucky and the Southwest.

Since 1944 the petitioner has been unable to meet its wholesale and retail gas supply requirements with gas produced and purchased in West Virginia and Kentucky, and in October, 1944, it began to purchase gas in large quantities from gas supply areas in the Southwest to meet its requirements for additional supplies of gas and it became necessary to increase the amount of its purchases of southwest gas from time to time until, in 1953, the petitioner received approximately 71 per cent of its gas supply from the Southwest in addition to its continued production and purchase of available gas in West Virginia and Kentucky.

The price which petitioner pays for southwest gas is fixed by the Federal Power Commission. In 1950 the price of southwest gas purchased by the petitioner on a high load factor was less than the price of the gas produced and purchased in West Virginia but the price of the southwest gas was subsequently increased and during the test period the price of that gas was 28.33 cents per Mcf. as compared with the price of 23.21 cents per Mcf. for gas produced and purchased in West Virginia.

During the year 1953 the petitioner produced 28,778,000 Mcf. of gas in West Virginia and it purchased 18,256,747 Mcf. of gas from other West Virginia producers or a total of 47,034,747 Mcf. of gas produced and purchased by it in West Virginia, and of this total supply of West Virginia gas it sold to its West Virginia customers 21,903,491 Mcf. of gas. From these figures it appears that the petitioner produced and purchased more than twice as much West Virginia gas during the year 1953 as it sold and delivered to its West Virginia consumers. During the test period the petitioner purchased 20,133,911 Mcf. of gas in West Virginia, 16,693,547 Mcf. of gas in Kentucky, and 176,193,743 Mcf. of southwest gas at a total cost of $56,755,000.00, or about two-thirds of its total service cost of $82,896,323.00. The petitioner purchases its southwest gas under a contract by which it was required to pay to the Tennessee Gas Transmission Company $11,853,208.00 as a demand charge and $37,796,724.00 as a commodity charge, or a total of $49,649,932.00, during the test period.

More than 85 per cent of the entire business of the petitioner consists of interstate sales of gas to five wholesale customers. It also serves approximately 107,600 customers in West Virginia, approximately 20,000 customers in Kentucky, and approximately 10,700 customers in Ohio. The intrastate portion of its business in West Virginia is regulated by The Public Service Commission of West Virginia and the intrastate portion of its business in Ohio and Kentucky is subject to regulation by the public service commission in each of those states. During World War II its market requirements were greatly increased and in the period from 1945 to 1953 its retail sales in West Virginia increased 57.2 per cent and its total sales increased 111.39 per cent. This increase resulted from the requirements of existing retail markets and existing wholesale customers.

In 1953 the petitioner supplied the Columbia Gas System of which it is an affiliate with more than one-half of all the gas sold by it in the entire territory which it serves. About one-third of the southwest gas does not

enter the facilities of the petitioner but is delivered by the Tennessee Gas Transmission Company directly into the facilities of other subsidiaries of the Columbia Gas System which purchase the gas from the petitioner at wholesale in Kentucky. Another one-fourth of the southwest gas is delivered to the petitioner at Broad Run, near Clendenin, in this State and, after passing through the transmission system of the petitioner for a distance of about 2,000 feet, most of that gas is delivered to an affiliated company or placed in storage for use by the Columbia Gas System when and as needed. The investment of the petitioner increased from $85,849,000.00 in 1946 to $152,-362,000.00 in 1953 and these figures represent an increase in investment of approximately 77 per cent.

It is generally recognized that the most economical delivery of natural gas occurs when it is made at a uniform rate throughout the year and that it can be purchased more advantageously when it is received periodically in uniform volumes. Consumption of gas, however, varies substantially from period to period. Weather conditions, especially those affecting the heating requirements during the winter months, cause seasonal variations in residential and commercial sales. Other factors frequently affect the demand for industrial use of gas. To meet these fluctuations in demand the petitioner since 1948 has constructed and maintained nineteen separate underground storage pools all of which are located in West Virginia. This arrangement enables the petitioner to purchase southwest gas in comparatively regular quantities each month and to store gas not needed to supply the summer demand for withdrawal for consumption during the winter and to meet its peak demands. Its investment in these storage facilities is in excess of $27,000,000.00 and the annual cost incurred in connection with them is in excess of $4,500,-000.00. By the end of the year 1953 the petitioner had 62,600,000 Mcf. more gas than it had withdrawn and this amount is nearly three times as much as the total annual sales to its West Virginia customers and is about 25 per cent of the amount of its entire annual sales. Gas pro-

duced in West Virginia is stored in two of these pools but West Virginia customers receive gas from only one of them and the West Virginia gas taken from the other of these two pools goes to customers of the petitioner in other states. Fourteen other pools are supplied with southwest gas and West Virginia customers receive gas from some or all of these fourteen storage pools.

The operations of the petitioner necessitate an extensive transmission system. Its net investment in transmission facilities for the complete operation of its system is approximately $22,000,000.00 and more than three-fourths of these facilities are located in West Virginia. These facilities include numerous compressor stations and large transmission lines which are used by the petitioner in supplying both its wholesale customers and its West Virginia consumers of gas.

In this proceeding the commission considered the total costs incurred by the petitioner in the operation of its entire system under these six categories of functional operations: (1) Production of liquified petroleum gas, for which the petitioner constructed between 1946 and 1948 at a cost of approximately $1,800,000.00 a separate facility consisting of three plants to meet the peak requirements of its customers whenever such requirements exceeded the gas supply available from other sources, but which facility has not been operated since 1951; (2) production and purchase of natural gas; (3) extraction of by-products from natural gas; (4) underground storage of gas; (5) transmission of natural gas from the source of supply to the distribution system or to wholesale customers; and (6) distribution of natural gas at retail to the ultimate consumer.

Upon this review the petitioner contends that certain specific findings of fact by the commission are unsupported by the evidence or are contrary to the evidence. These challenged findings are: (1) That West Virginia customers of the petitioner are in fact supplied with West Virginia gas; (2) that the segregation method used by the com-

mission properly assigns to its West Virginia customers the cost associated with the service furnished to those customers; (3) that only four per cent of the underground storage costs should be assigned to its West Virginia customers; (4) that the underground storage cost should be allocated on the basis of a peak day; (5) that storage gas used by its West Virginia customers was produced or purchased in West Virginia; (6) that the underground storage factor used by the commission was mathematically accurate; (7) that the classification of costs by the commission between demand and commodity are proper; and (8) that demand costs should be allocated to the West Virginia customers on the basis of a peak month rather than a peak day.

In its statement of reasons filed by the commission upon this review the commission said: "The gas rates for appellant's West Virginia customers should be based upon the costs of the gas they actually consume, which is produced here, rather than upon the costs of gas from Texas purchased by appellant to supply the Columbia Gas System for its consumers elsewhere." In the report filed by the commission there is also this statement: "The Commission is of the opinion that inasmuch as the Applicant has a supply of local gas adequate to meet its local demands, and does in fact use such gas as its principal supply for local demands, the rates charged its customers in West Virginia should be based upon the costs of local gas rather than upon the costs of southwest gas or of the two when commingled."

Neither the finding of the commission that the West Virginia customers actually consume only gas produced in West Virginia nor the finding that the rates charged its West Virginia customers for the gas consumed by them should be based upon the cost of gas produced in West Virginia is supported by the facts established by the evidence.

Though the evidence shows that the amount of the gas actually produced in West Virginia is more than twice the amount of the gas consumed by the West Vir-

ginia customers of the petitioner, the evidence also shows without question that the total supply of West Virginia gas, or enough of it to meet the requirements of its West Virginia customers, can not be economically or practically delivered by the petitioner to those customers in the proper operation of its system as originally located and constructed and as maintained and operated during the test period. As already indicated, in the development of its system and the construction and maintenance of its transmission and distribution facilities, the petitioner originally located, and still maintains on their original location, transmission lines to serve its interstate customers at various distribution centers to comply with its valid contractual obligations. More than one-half of the gas produced in West Virginia can be transported and delivered only by those interstate transmission lines. Because of the lower pressure at the West Virginia wells, as compared with the higher pressure at which the southwest gas is produced, only a relatively small part of the West Virginia gas can be delivered and placed in underground storage and because of the present location of the transmission lines through which the gas produced in West Virginia must pass, all of it, or even enough of it to satisfy the consumption requirements of its West Virginia consumers, can not be delivered to those customers by the petitioner.

There is no suggestion by the commission or by any interested party that the construction and maintenance of its transmission lines as originally and presently located resulted from faulty management or management conducted in bad faith, or from any inefficient, unreasonable, extravagant, or wasteful managerial policies or practices upon the part of the petitioner. On the contrary it clearly appears that the construction and the subsequent maintenance of its transmission lines upon their original location for many years were effectuated by the petitioner to enable it to serve efficiently legitimate markets in various areas in other states and not for the purpose of depriving its West Virginia consumers of a full supply of the gas produced in this State.

To enable the petitioner to supply all of the consumption requirements of its West Virginia consumers with West Virginia produced gas it would be necessary for the petitioner to change the location of its transmission lines or to construct new pipe lines and other facilities to place the gas produced in West Virginia in storage to meet the winter requirements of its consumers. To change the location of the lines which transport the West Virginia gas to its customers in other states, from their original location where they have been maintained for many years, or to construct new transmission lines to distribution points at which the gas produced in West Virginia could be delivered to West Virginia customers, would necessarily substantially increase the cost of production of West Virginia gas; and, although no witness has suggested that the transmission lines through which West Virginia produced gas passes should be relocated or has estimated the cost of changing their location, or of constructing the necessary new facilities, to enable the petitioner to deliver all of the gas produced in West Virginia to its West Virginia consumers, it is clear that any such rearrangement of the transmission system as now located and maintained would increase the cost of production of West Virginia gas to a point which would substantially exceed the cost of southwest gas and would ultimately necessitate the establishment of a much higher rate to the consumers of the gas produced in West Virginia.

The commission apparently based its conclusion that the petitioner "has a supply of local gas adequate to meet its local demands, and does in fact use such gas as its principal supply for local demands", upon the testimony of the witness Blundon, one of the consultants to the commission and a qualified expert of many years experience in the field of public utility rates, who expressed the opinion that West Virginia consumers were, to the possible extent of ninety per cent, furnished with West Virginia gas by the petitioner. He stated no facts as the basis for his opinion and he admitted that West Virginia gas could not be made available to some of the

West Virginia markets and that he had made no detailed study to determine the cost of changing the present facilities of the petitioner or to provide additional facilities to enable it to furnish West Virginia gas to all its West Virginia consumers. His associate, Snyder, also an experienced consultant, testified that he did not think it would be possible to supply West Virginia customers solely with West Virginia gas by the use of existing facilities and that he had made no study of the cost of service to supply West Virginia consumers entirely with West Virginia gas.

Both Blundon and Snyder also testified to the effect that even if the West Virginia consumer could not actually be supplied entirely with West Virginia gas the West Virginia consumer was entitled to West Virginia gas to satisfy his consumption needs and to the benefit of the cost of gas produced in West Virginia. This testimony is a mere expression of the belief or the desire of these expert witnesses and simply voices their judgment as to the proper decision of that question in this proceeding. As characterized by this Court in *Bluefield Telephone Company* v. *The Public Service Commission of West Virginia*, 102 W. Va. 296, 135 S. E. 833, their expert testimony is "most unsatisfactory evidence." It furnishes no facts which could serve as a basis for their conclusion and it would substitute their judgment for that of the commission. It does not support or justify the finding of the commission on that point. Nor does it follow, either in law or in logic, that a consumer of the lower cost West Virginia gas, who needs more West Virginia gas than can be reasonably or practically furnished him by the petitioner, is entitled to an amount of gas produced elsewhere at a higher cost to make up the deficiency between the amount of West Virginia gas which can be so supplied to him and the amount of such gas necessary to satisfy his needs, at the price charged for the lower cost West Virginia gas which can not be furnished. On the contrary to require the petitioner to furnish this equivalent at a loss of the difference between the lower production cost of West Virginia gas and the

higher production cost of gas obtained from another source would constitute confiscation of the property of the petitioner to the extent of the loss thus sustained by it which can not be recovered from its consumers of gas in other states. See *City of Huntington* v. *Public Service Commission*, 89 W. Va. 703, 110 S. E. 192. In that case this Court held in point 6 of the syllabus that deprivation of the right of a public utility "to earn a reasonable return upon the full fair value of its property amounts to a confiscation thereof *pro tanto.*"

The report of the commission which adopts the conclusion of the witness Blundon that 90 per cent of the gas supply for West Virginia consumers comes from West Virginia produced gas by necessary implication admits that 10 per cent of the gas supplied to the West Virginia customers is not produced in West Virginia and refutes its finding and conclusion that "inasmuch as Applicant has a supply of local gas adequate to meet its local demands, and does in fact use such gas as its principal supply for local demands, the rates charged its customers in West Virginia should be based upon the costs of local gas rather than upon the costs of southwest gas or of the two when commingled."

The principle is well established by the decisions of this Court that an order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles. *The City of Huntington* v. *State Water Commission,* 137 W. Va. 786, 73 S. E. 2d 833; *Town of Harrisville* v. *Public Service Commission,* 103 W. Va. 526, 138 S. E. 99; *Bluefield Telephone Company* v. *The Public Service Commission of West Virginia,* 102 W. Va. 296, 135 S. E. 833; *City of Huntington* v. *Public Service Commission,* 101 W. Va. 378, 133 S. E. 144; *Pittsburgh and West Virginia Gas Company* v. *The Public Service Commission of West Virginia,* 101 W. Va. 63, 132 S. E. 497; *The Baltimore and Ohio Railroad Company* v. *The Public Service Commission of West*

*Virginia,* 99 W. Va. 670, 130 S. E. 131; *Baltimore and Ohio Railroad Company* v. *Public Service Commission,* 90 W. Va. 1, 110 S. E. 475; *City of Huntington* v. *Public Service Commission,* 89 W. Va. 703, 110 S. E. 192; *City of Charleston* v. *Public Service Commission,* 86 W. Va. 536, 103 S. E. 673; *Mill Creek Coal and Coke Company* v. *Public Service Commission,* 84 W. Va. 662, 100 S. E. 557, 7 A.L.R. 1081; *Norfolk and Western Railway Company* v. *The Public Service Commission,* 82 W. Va. 408, 96 S. E. 62, 8 A.L.R. 155; *United Fuel Gas Company* v. *Public Service Commission,* 73 W. Va. 571, 80 S. E. 931.

The principle is likewise well established by the decisions of this Court that an order of the public service commission based upon a finding of facts which is contrary to the evidence, or is not supported by the evidence, or is arbitrary, or is based upon a mistake of law, will be reversed and set aside by this Court upon review. *Charleston Transit Company* v. *Public Service Commission,* 142 W. Va. 750, 98 S. E. 2d 437; *City of Huntington* v. *State Water Commission,* 135 W. Va. 568, 64 S. E. 2d 225; *Atlantic Greyhound Corporation* v. *Public Service Commission of West Virginia,* 132 W. Va. 650, 54 S. E. 2d 169; *Reynolds Transportation Company* v. *Public Service Commission,* 125 W. Va. 690, 26 S. E. 2d 519; *Anchor Coal Company* v. *Public Service Commission,* 123 W. Va. 439, 15 S. E. 2d 406; *The City of Wheeling* v. *The Natural Gas Company of West Virginia,* 115 W. Va. 149, 175 S. E. 339, 294 U. S. 698, 55 S. Ct. 634, 55 S. Ct. 658, 79 L. Ed. 1235, Dismissed, 296 U. S. 659, 56 S. Ct. 87, 80 L. Ed. 469; *United Fuel Gas Company* v. *Public Service Commission,* 103 W. Va. 306, 138 S. E. 388, 52 A.L.R. 1104; *Baltimore and Ohio Railroad Company* v. *Public Service Commission,* 81 W. Va. 457, 94 S. E. 545, L.R.A. 1918D, 268. See also *Ohio Bell Telephone Company* v. *Public Utilities Commission of Ohio,* 301 U. S. 292, 57 S. Ct. 724, 81 L. Ed. 1093; *Northern Pacific Railway Company* v. *The Department of Public Works of the State of Washington,* 268 U. S. 39, 45 S. Ct. 412, 69 L. Ed. 836; *Hammond Lumber Company* v. *Public Service Commission,* 96 Or. 595, 189 P. 639, 9 A.L.R. 1223; 43 Am. Jur., Public Utilities and Services, Section 229.

The foregoing finding and conclusion of the commission is not supported by the evidence and the final order of the commission, which is based upon such finding and is also based upon an error of law, must be reversed and set aside for those reasons. In point 3 of the syllabus in *Atlantic Greyhound Corporation* v. *The Public Service Commission of West Virginia,* 132 W. Va. 650, 54 S. E. 2d 169, this Court held that "A final order of the Public Service Commission based upon findings not supported by evidence, or based upon a mistake of law, will be reversed and set aside by this Court upon review."

The petitioner contends that the proper portion of the production and transmission costs incurred by it which should be assigned to its West Virginia consumers and charged to its West Virginia business should be determined on the basis of the ratio between the total cost of the business operated by its entire system and the cost of the deliveries of all the gas furnished to its West Virginia consumers in the operation of its intrastate business in this State during the test period of one year; and in pursuance of that method it classifies the total costs incurred into demand costs and commodity costs.

It is well recognized that all utilities generally classify their entire expenses in two main categories. One category embraces fixed or demand costs and the other embraces variable or commodity costs. If the cost is incurred solely for the purpose of enabling the utility to meet the peak or maximum requirements of its consumers at any given time or period and does not vary with the volume of sales the cost is a demand cost. If, however, the cost incurred varies directly with and depends upon the volume of sales it is a commodity cost. Bryant and Herrmann, Elements of Utility Rate Determination, First Edition, 1940. At page 313 of that publication the text contains these statements: "All utilities are generally able to classify their entire expenses under two main headings: fixed and variable. The 'fixed costs' are those which remain the same whether the amount of business is the same from month to month or whether

it varies from small to large amounts. * * *. In addition to the fixed costs, nearly all utilities have expenses of operation that vary from month to month, depending upon the amount of sales. All these expenses are called 'variable expenses,' for they vary according to some law tied up with variations in output." Application of the method employed by the petitioner, which would allocate the production and transmission costs, the costs of underground storage being considered as a part of the transmission costs, on the basis of the ratio between the total amount of those costs for all the gas delivered by the operation of its entire system and the amount of the costs of all the gas, including gas produced in this State, in Kentucky and gas obtained from the Southwest, sold and delivered to its West Virginia consumers, would assign to them and to its intrastate business in this State between 10 per cent and 11 per cent of the entire amount of its total production and transmission costs, or $8,437,722.00 of the total production and transmission costs of $78,852,783.00.

The commission recognized and considered the distinction between demand costs and commodity costs and adopted a factor of 14.180 per cent of the costs assignable to demand and a factor of 9.085 per cent of the costs assignable to commodity for the intrastate business of the petitioner in this State. The percentages used by the petitioner in assigning costs to its West Virginia consumers were 14.655 per cent for demand costs and 9.244 per cent for commodity costs. As there is no considerable difference between these percentage factors and as the petitioner does not object to the respective factors adopted by the commission but in effect accepts them as adequate they will be considered as correct and proper upon this review.

The commission, however, rejected the allocation method employed by the petitioner and instead adopted a segregation method recommended by the witness Blundon which is described by him in these terms: "segregation, sometimes spoken of as separation, means just what

it implies, an actual separation of the property devoted to a given service and a separation of the expenses devoted to that service." By the use of the segregation method the commission considered only that portion of the facilities of the petitioner used or useful in the service of its West Virginia consumers that are located in this State and excluded all of the facilities of the petitioner in the operation of its system that are located outside the State of West Virginia. On this point the supplemental brief filed in behalf of the commission contains this statement: "For the purpose of arriving at the costs of service applicable to West Virginia customers of the United Fuel, the Commission considered the segregated area (West Virginia operations) only."

The commission in the use of the segregation method also excluded from consideration 70 per cent of transmission line P which extends from a compressor station in Kentucky where it receives gas to a compressor station at Kenova, West Virginia, where it delivers gas and, though only approximately 30 per cent of the line is located in this State, substantial quantities of gas transported through it are delivered to West Virginia consumers; 78.4 per cent of transmission line B and 98.6 per cent of transmission line BM-22, both of which lines lie partly in Kentucky and partly in West Virginia but each of which delivers quantities of gas which are used by West Virginia consumers; 2,000 feet of a transmission line which carries southwest gas from Broad Run to Cobb compressor station in this State where it is delivered to subsidiaries of the Columbia Gas System or is placed in some of the fourteen storage pools in this State; and transmission line BM-66 located in this State and through which southwest gas is delivered to the Ohio Fuel Gas Company after it enters this line near Kenova.

As to some of these exclusions the report of the commission contains these statements: "The applicant assails this separations study because it excludes from consideration that portion of certain transmission lines

which lie partly in West Virginia and partly in Kentucky but carry certain quantities of West Virginia intrastate gas. To the extent that this exclusion vitiates the end result the criticism has merit. An examination of Consultants' Exhibit 1, however, along with the Applicant's Exhibit 31 with reference to these particular transmission lines indicates that the consultants applied to the West Virginia portions of these lines a much higher factor for allocation purposes than was applied by the Applicant to the lines as a whole. As a result, the difference in the end result is negligible."

The evidence clearly shows that large quantities of gas produced in Kentucky and in the Southwest through facilities located outside this State are delivered to and used by West Virginia consumers. The evidence shows without contradiction that only approximately 20,000,000 cubic feet of gas produced in West Virginia can be delivered daily to the consumers of gas in Charleston, West Virginia; that they require substantially more gas during an average winter day; that their peak requirements are in excess of 70,000,000 cubic feet; and that these requirements are met to a considerable extent by southwest gas. The consumers of gas in Huntington, West Virginia, also use southwest gas. The evidence also shows beyond question that the plant of the petitioner has been constructed and maintained from the beginning, and was operated during the test period, as an integrated, unified, and closely interwoven system in which all of its production and transmission facilities are used to provide adequate service to all of its consumers of gas in common and without regard to the location of its various areas of consumption.

There is and should be no inflexible rule which requires the application in all cases of either the allocation method or the segregation method. Either method may be properly applied where the facts in any particular case justify the application of one method instead of the other. In this proceeding, however, the allocation method should have been applied by the commis-

sion instead of the segregation method which does not conform to the facts established by the evidence. This statement of the Kansas Public Utilities Commission in *Landon* v. *Lawrence,* Public Utilities Report 1916B, page 331, quoted in the opinion in *Pittsburgh and West Virginia Gas Company* v. *The Public Service Commission of West Virginia,* 101 W. Va. 63, 132 S. E. 497, applies to the facts shown by the evidence in this proceeding: "The value of property used in transporting and distributing natural gas in two states may be divided upon the basis of use, in the proportion that the volume of gas used in each state, respectively, bears to the entire volume passing through the line."

By the action of the commission in using the segregation method, in considering only the production and transmission facilities located within West Virginia, and in excluding from consideration other such facilities which the evidence shows are used and useful in the service rendered to its consumers of gas in this State, the petitioner has been deprived of the right to earn a reasonable return upon the full fair value of its property used and useful in the operation of its intrastate business in this State in violation of the fundamental legal principle that a utility is entitled to earn a reasonable return upon the whole of its property devoted to public service. Point 3, syllabus, *City of Huntington* v. *Public Service Commission,* 89 W. Va. 703, 110 S. E. 192. Deprivation of the right to earn a reasonable return upon the full fair value of the property of such utility is, to that extent, confiscation of its property. Point 6, syllabus, *City of Huntington* v. *Public Service Commission,* 89 W. Va. 703, 110 S. E. 192.

Instead of giving proper consideration to the integrated system actually maintained and operated by the petitioner, which functions as a unit and can not function effectively as separate or distinct parts or sections, the commission has undertaken to create a fictitious, nonexistent plant whose facilities, contrary to the facts, end at state lines and which, as so fabricated, could not be operated prac-

tically, efficiently or economically as a separate part of the entire system and as such could not furnish the West Virginia consumers of the petitioner with sufficient gas to meet their consumption requirements. As succinctly stated by the witness Williamson, an independent consultant and a former chief accountant of the commission: "The allocation method used by the Company deals with facts. The segregation method strays from actual operating facts and makes assumptions which are obviously fictitious and cannot be used in actual operation." In discussing the effect of the action of the public service commission in disregarding facts established by evidence, Judge Poffenbarger, in a concurring opinion in the case of *United Fuel Gas Company* v. *Public Service Commission,* 73 W. Va. 571, 80 S. E. 931, used this pertinent language: "Action in disregard of the evidence is, therefore, action outside of and beyond the statutory authority of the Commission and void."

It is evident that the erroneous result reached by the commission by the use of the segregation method is due to its erroneous finding of fact that "the Applicant has a supply of local gas adequate to meet its local demands, and does in fact use such gas as its principal supply for local demands" and its legally erroneous conclusion that "the rates charged its customers in West Virginia should be based upon the costs of local gas rather than upon the costs of southwest gas or of the two when commingled."

The commission cites and relies upon the decision of this Court in *The City of Wheeling* v. *The Natural Gas Company of West Virginia,* 115 W. Va. 149, 175 S. E. 339, 294 U. S. 698, 55 S. Ct. 634, 55 S. Ct. 658, 79 L. Ed. 1235, Dismissed, 296 U. S. 659, 56 S. Ct. 87, 80 L. Ed. 469, to sustain its use of the segregation method in this proceeding. On the contrary that case gives recognition to the use of the allocation method instead of the segregation method used by the commission in this proceeding and held in point 7 of the syllabus that "In arriving at a proper allocation of the utility's properties used and useful in the service in this state, due consideration should be given to

the physical make-up of such properties, the movement of the gas within the states served, and the gas sales." In the opinion with respect to the allocation of property this Court used this language:

"The gas sales method of allocation adopted by the commission apportions 50.71% of the production, transmission, and general property to the consumers in this state, thus wholly ignoring where the gas is sold or how much property is necessary to produce and transport that gas to market.

"A cursory examination of the operations map of the company's properties (which includes a portion of the panhandle in the vicinity of Wheeling, a large acreage in Ohio to the west and north, and an acreage in Pennsylvania to the east), together with evidence that very little gas is being transported into this state from Ohio, shows that the greater part of the production and transmission system in Ohio is devoted solely to the business in that state. Therefore we are of opinion that some basis for a division independently of gas sales must be invoked in ascertaining the value of the property used and useful in the regulated business in this state. *Minnesota Rate Cases*, 230 U. S. 356, 33 S. Ct. 729, 57 L. Ed. 1511; *Smith* v. *Illinois Bell Telephone Co.*, 282 U. S. 133, 51 S. Ct. 65, 75 L. Ed. 255. The mere fact that the utility is an integrated whole, does not, in our opinion, preclude the commission from giving consideration to the percentage of gas transported within the three states. Williamson, the commission's statistician, in making his report took into consideration the foregoing as well as the percentage of gas sold in the three states. In so doing, he allotted to this state 53% of the production, 33% of the transmission, and 48% of the general properties, or an over-all average of 40.6%. Without approving his percentages, we remand the matter of allocation for further consideration in conformity with the foregoing suggestions."

From the language just quoted it appears that this Court in that case did not reject the allocation method or

indicate that the segregation method, which is not mentioned in the opinion, should have been used but instead remanded the question of allocation for further consideration for the reason that the percentage of the production, transmission and general properties of 50.71% allocated to the consumers of gas in this State was a higher percentage than the percentage warranted by the evidence in that proceeding.

Inasmuch as the final order of the commission, for the reasons indicated, is erroneous and must be reversed and this proceeding must be remanded to the commission for further consideration and final determination of the factual questions involved, the action of the commission in assigning certain percentages of the costs incurred to demand and commodity for the various functional operations of the petitioner is likewise reversed and set aside. It is pertinent, however, to observe that as the evidence shows clearly that the liquefied petroleum gas facility was designed and is maintained to meet peak and emergency capacity requirements and not to produce annual volumes of gas, the costs associated with that facility should have been assigned entirely to demand instead of 50 per cent to demand and 50 per cent to commodity as determined by the commission. The evidence also shows that an element of demand is associated with the production and purchase of southwest gas and a proper percentage of the cost of that service should be determined and assigned to demand costs by the commission in its further consideration of this proceeding. The action of the commission in assigning costs associated with the maintenance and the operation of its storage pools to the West Virginia consumers of the petitioner only in proportion to the extent in which they participate in storage gas deliverability based upon the demands of an estimated five degree peak day results from an estimate, which is not supported by the evidence, that the West Virginia consumers required on such peak day less than two per cent of the gas withdrawn from storage from the entire system. Notwithstanding the estimate of two per cent the

commission adopted an arbitrary figure of four per cent and erroneously assigned to the West Virginia consumers of the petitioner only four per cent of the storage cost of service in the amount of $180,487.00. On the remand of this proceeding the commission should consider and determine, from the evidence disclosed by the present record and such additional evidence, if any, as may be properly considered, and by the application of established principles of law, the proper percentages of the cost of service of its various operational functions to be assigned to demand and commodity costs.

The petitioner contends that demand costs to its consumers should be allocated on the basis of a peak day during the test period and that the peak day requirements should be determined as of Tuesday, January 12, 1954, which was within that period. The commission rejected that method and instead allocated demand costs to the West Virginia consumers on the basis of a peak month. The peak day method has received judicial sanction and either method in a proper case may be used to the exclusion of the other. In *City of Pittsburgh* v. *Pennsylvania Public Utility Commission,* 178 Pa. Super. 46, 112 A. 2d 826, 8 PUR 3d 205, the Superior Court of Pennsylvania approved the action of the commission in allocating costs upon the basis of a peak day instead of a three day peak period and in the opinion used this language: "There was no reversible error in the commission's method of allocation. The day of greatest system-wide demand in the test year to meet the needs of Pennsylvania retail customers was February 17, 1953. The one-day peak represented the day of greatest system-wide usage by Pennsylvania retail customers. The utility's system was obliged to be prepared to meet this demand. The city's proposed method of allocation on the basis of an average of three-day peak sales would not meet the maximum plant requirement." The evidence shows clearly that the plant of the petitioner and the method of its operation are designed to meet the peak day requirements of its consumers and that the petitioner in fact did meet such requirements on the peak day, Tues-

day, January 12, 1954. It is also clear from the evidence that the requirements of a peak month are less than the requirements of a peak day and that a plant of less capacity which would meet the requirements of a peak month would not meet the requirements of a peak day. The peak month method would determine the average requirements for that period which would necessarily be less than the actual requirements for the peak day which is the day on which the maximum usage occurs. Though the requirements of a peak day and the requirements of a peak month can not be determined with absolute accuracy because the meter readings are taken at different times and not simultaneously, the evidence indicates clearly that the amount of gas actually used to meet the maximum demands of the consumers on a system wide basis can be and was ascertained with a greater degree of accuracy on a single peak day than during a peak month. The evidence shows that the peak day method is a proper method for the allocation of the demand costs to the consumers of the petitioner and upon the facts established by the record that method should have been used by the commission.

The final order of the commission entered August 26, 1955 and the supplementary order entered September 8, 1955, being erroneous, are reversed, the findings of fact by the commission, on which those orders are based, are set aside, and this case is remanded to the commission for such further proceedings as may be necessary to enable it to fix and determine a just and reasonable rate for the intrastate service furnished by the petitioner, in accordance with established principles of law and in conformity with the principles enunciated in this opinion.

*Reversed and remanded.*